842 A.2d 773

**Richmond C. LANEY**

**v.**

**STATE of Maryland.**

**No. 44, Sept. Term, 2003.**

Court of Appeals of Maryland.

Feb. 13, 2004.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for petitioner.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

Richard C. Laney was convicted in the Circuit Court for Howard County of unlawful possession of a destructive device and unlawful possession of an explosive without a license. We now review the Circuit Court's denial of Laney's motion to suppress evidence seized during several warrantless searches of Laney's former residence, 3612 Fels Lane in Ellicott City, Maryland. Laney asserts that, although he did not hold title to 3612 Fels Lane, he had an expectation of privacy in the property, and the entry upon the premises violated his Fourth Amendment right to be free from unreasonable searches and seizures. We hold that Laney had no reasonable expectation of privacy in 3612 Fels Lane because ownership of the property had passed to the Department of Veterans Affairs (hereinafter the "DVA"), which, accordingly, had authority to enter, possess, and give consent for the authorities to search the property. Therefore, no Fourth Amendment violation occurred in this case, and the Circuit Court was correct in denying Laney's motion to suppress.

## I. Background

### A. Facts

Some time prior to December of 1998, Laney purchased improved real property located at 3612 Fels Lane in Ellicott City, Maryland. To finance the purchase, Laney acquired a loan, which was secured by 3612 Fels Lane and guaranteed by the DVA. Under the DVA loan guarantee, if the lender foreclosed on the loan, it could convey title to the property to the DVA. Laney failed to make payments according to the

loan agreement, and, on December 13, 1999, the loan was foreclosed. On December 27, Commercial Federal Mortgage Corporation, the purchaser of 3612 Fels Lane at the foreclosure sale, initiated the process of conveying the property to the DVA by providing it with a "notice of intention to convey." Commercial Federal subsequently conveyed title to 3612 Fels Lane to the DVA on March 17, 2000.

The DVA assigned Brad Criddle the responsibility to "manage" the property, meaning that he would "attend to or look after" the foreclosed property. As part of the management responsibilities, if Criddle were to find a property occupied, he would attempt to contact the person occupying the house to discuss the DVA's eventual possession of the property. Criddle made his first visit to 3612 Fels Lane in December of 1999 and knocked on the door of the house. When he received no response, he left his business card, which provided his name and phone number, identified Criddle as the property manager, and stated that the property was owned by the DVA. During this and subsequent visits, which Criddle made at least once a month, the house appeared to be occupied because personal property could be seen through the windows and objects around the outside of the house would appear to have been moved between visits.

Criddle, however, could not establish contact with anyone at the house until 11:00 a.m. on July 14, 2000, when he stopped by 3612 Fels Lane to encourage whomever was in the home to abandon the property. As he walked toward the front door, he encountered two men, one of whom was Joseph Winkle, who lived across the street. Winkle explained to Criddle that he was there to "rescue" some geese on the property for Laney, the former occupant of the house, who had been his neighbor for fifteen years and was currently in prison.

Winkle explained further that, although he had obtained a key to the house from Laney's brother, he was afraid to enter the house because he believed there were "explosives and weapons" kept there.

Because one of Criddle's responsibilities as a property manager was to "make every effort to get in the house," he asked

Winkle to let him inside the house to look around. Winkle agreed and opened the door. Inside the house, Criddle observed, in one room, a couple of olive green objects shaped like "two liter bottle[s]" and marked with "U.S. Army" in black writing and, in another room, "five or six grenades" in a trash can. When he went upstairs, he found "several guns, gun barrels, . . . camouflage[,] . . . . kni[v]es, . . . [and] numerous shell casings. . . ." Criddle went to the outside shed where he observed "something that looked like a small rocket . . . [and] other empty cartridge containers [and] shell casings . . . everywhere." Other than the weapons and ammunition, Criddle saw that the bathtub had been removed and that some of the home appliances were sitting on the front porch. This gave Criddle the impression that "somebody was dismantling the house[,] . . . selling it off piece by piece."

Criddle left the house, called the DVA for instructions on how to proceed, and was told to grant access to the property to local authorities. He called the Howard County Police Department. About an hour and a half after his initial visit to 3612 Fels Lane on July 14, Criddle returned to the property and met Frank McCreary of the DVA and Officer Keith Berry of the Howard County Police Department. Criddle identified himself to Officer Berry and described what he had seen in the house. Criddle then led Officer Berry into the unlocked house, where they looked around for five minutes. Other police officers, including Officer Keith Fisher and the State Fire Marshall arrived at the house and obtained written consent from the DVA to inspect the property. Thereafter, at the request of those officials, personnel of the fire department, Federal Bureau of Alcohol, Tobacco and Firearms ("ATF"), Federal Bureau of Investigation ("FBI"), and the U.S. Army's Explosive Ordnance Disposal Company ("EOD") arrived at the scene.

The police and Army officials thoroughly searched the house, spending several hours taking objects from the house and laying them on a tarp outside on the lawn. The following items, as listed on the EOD Incident Report, were seized and later disposed of by the authorities:

26 M228 Fuze, Grenade; 1 M201A1 Fuze, Grenade; 2 Grenade body, practice; 1 Grenade fuze, model unknown; 9 M117 Boobytrap simulators; 2 Commercial blasting caps; 3 20mm projectile, practice; 1 60mm mortar, illumination; 1 M51 projectile fuze; 1 60mm mortar, practice with residue; 2 M18 smoke grenade; 1 M7A3 smoke grenade, riot; 2 40mm illumination projectiles; 1 British Mill Bomb (grenade); 1 M158 Red star cluster signal; 1 M604 Fuze, mine practice; 1 Boobytrap flare on stake; 3 PML 62 Friction fuze; 1 Vial of black powder; 1 KDM 51A2(20); 1 2.36 inch Rocket; 7 flare pens, with ignitors; 1 20–foot piece of commercial detonating cord; 1 40mm projectile, practice; 10 15mm projectiles, German; 18 Blast simulator; 1 6000psi pressure bottle; 1 81m projectile, practice; 4 pounds of smokeless powder; 1 model rocket motor; 1 DM 28 subcaliber projectile (UEB–T); 1 SWAT Distraction Device (flashbang); 9 fuzes, German; 1 M48 subcaliber projectile; 6 M73 35mm subcaliber rockets, practice (for LAW).

Criddle had the locks of the house changed to a DVA master key lock after all of the law enforcement and military personnel left the house at around 10:00 p.m. on July 14. Three days later, on July 17, 2000, Criddle unlocked 3612 Fels Lane and allowed police officers and agents of the State Fire Marshall to search the house with a K–9 unit. As a result of that search, other items were seized. On July 21, 2000, Criddle again unlocked the house, this time to permit Army officials to look for a radio. He then hired a contractor to clean the property, making it possible for the DVA to market and eventually sell the house.

### B. Procedural History

The State charged Laney in the Circuit Court for Howard County with nine counts of possession of a destructive device in violation of Maryland Code, Article 27, Section 139C (1957, 1996 Repl.Vol., 2000 Supp.),[1] one count of reckless endanger-

---

1. Maryland Code, Article 27, § 139C (1957, 1996 Repl.Vol., 2000 Supp.) states:

ment in violation of Maryland Code, Article 27, Section 12A–2 (1957, 1996 Repl.Vol., 2000 Supp.),[2] and one count of possession of explosives without a license in violation of Maryland Code, Article 38A, Sections 27A and 34C (1957, 1997 Repl. Vol.).[3]

Laney moved to suppress the evidence obtained from 3612 Fels Lane on the ground that it was seized in violation of Laney's Fourth Amendment guarantee against unreasonable searches and seizures. The court denied Laney's motion to suppress, concluding that the searches of 3612 Fels Lane and the seizures of property during those searches were lawful. Assuming that Criddle was a state agent for the purpose of its decision, the court reasoned that Criddle was a legal representative of the DVA, which had acquired title to 3612 Fels Lane and, thus, was the lawful owner of the property on the day of the initial search. The court determined that, as the agent of the lawful owner of the property, Criddle did not need to seek

---

A person may not knowingly:
(1) Manufacture, transport, possess, control, store, sell, distribute, or use a destructive device; or
(2) Possess any explosive, incendiary, or toxic material with intent to create a destructive device.

**2.** Maryland Code, Article 27, § 12A–2 (1957, 1996 Repl.Vol., 2000 Supp.) states in relevant part:
(a) *Creation of substantial risk of death or serious physical injury; penalties.*—(1) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine of not more than $5000 or imprisonment for not more than 5 years or both.

**3.** Maryland Code, Article 38A, § 27A (1957, 1997 Repl.Vol.) states: "No person shall possess any explosives other than explosives for use in firearms unless he has obtained a license to manufacture, deal in or possess such explosives pursuant to the provisions of § 28 of this subtitle."
Maryland Code, Article 38A, § 34C (1957, 1997 Repl.Vol.) provides: Any person who violates § 27A or § 31 of this subtitle, and who is not subject to the penalties otherwise provided in § 34A or § 34B, shall, upon conviction, be imprisoned for a term of not more than five years, or shall be fined not more than five thousand dollars ($5,000.00), or both, in the discretion of the court.

action by the court to enter the house legally. As an alternative basis for its ruling, the court concluded that Criddle "had the right to rely upon the consent" of Winkle, who "arguably was entitled to ... enter the premises." Finally, the court found Criddle's entry was justified because of the "exigency" created when he learned that "munitions" and "explosives" were in the house and that Winkle may have been selling house "fixtures."

The judge then conducted a bench trial on an agreed statement of facts and found Laney guilty of unlawfully possessing an explosive device without a license and one count of unlawfully possessing a destructive device. The State later *nolle prossed* all remaining counts. The court sentenced Laney to ten years' imprisonment for the possession of a destructive device and five years' imprisonment for the possession of an explosive device. The court suspended the sentences except for time served and ordered probation.

Laney appealed, challenging the denial of his motion to suppress, and the Court of Special Appeals, in an unreported opinion, affirmed the trial court's ruling. The intermediate appellate court determined that Laney's Fourth Amendment rights had not been violated on any of the occasions when 3612 Fels Lane was searched. The court concluded that, assuming Criddle was acting on behalf of the state, his first entry on July 14 was supported by probable cause and justified by exigent circumstances. Probable cause existed, in the court's view, because a person of reasonable caution would have believed contraband might be inside the house based on information learned from Winkle that explosives and weapons were inside the house and that he was afraid to go inside. According to the court, this same information, described as "credible evidence that the house was filled with explosive materials of unknown age and stability," validated Criddle's initial July 14 search also because "illegal explosives, or dangerous chemicals in a home has been repeatedly held to constitute exigent circumstances justifying a warrantless search." The court then held that the discovery of the weapons and munitions in the house escalated the exigency,

justifying the subsequent searches by law enforcement authorities on July 14. With respect to the July 17 search, the court determined that it was "a continuation of lawful initial entry," "confined to 'the scope of the original invasion,' and therefore did 'not require a warrant.' "

We granted Laney's petition for a writ of certiorari, *Laney v. State*, 376 Md. 139, 829 A.2d 530 (2003), to determine whether the seizure of the items in the house located at 3612 Fels Lane constituted infringements of Laney's Fourth Amendment rights.[4] We hold that, because Criddle, the agent of the title owner of the premises, had authority to possess and enter the house, Laney had no reasonable expectation of privacy in it. Therefore, Laney's Fourth Amendment rights were not violated when the authorities seized the evidence from the house.

## II. Standard of Review

When reviewing the denial of a motion to suppress evidence, we ordinarily consider only the evidence before the court at the suppression hearing. *State v. Green*, 375 Md. 595, 607, 826 A.2d 486, 493 (2003); *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 444 (2003). We view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the prevailing party on the motion. *Green*, 375 Md. at 607, 826 A.2d at 493; *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372, 376–77 (2003). Although we extend great

---

**4.** The questions as stated in Laney's petition do not define the precise issue that we address in this case. They read as follows:

1. Did government agents violate the Fourth Amendment when they repeatedly entered and searched Mr. Laney's home without a warrant based on a tip that there were weapons and explosives inside?
2. Did a neighbor and an owner pursuant to foreclosure, neither of whom were in possession of Mr. Laney's residence, have apparent authority to consent to multiple entries, searches and seizures by government agents?
3. May an appellate court affirm the denial of a motion to suppress evidence on the basis that warrantless entries and searches of a residence were justified by exigent circumstances where the trial court made no finding that these actions were justified by exigent circumstances?

deference to the hearing judge's findings of fact, we review, independently, the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed. *Green,* 375 Md. at 607, 826 A.2d at 493; *Wallace v. State,* 373 Md. 69, 78, 816 A.2d 883, 888–89 (2003).

## III.  Discussion

Laney avows that the multiple warrantless searches of 3612 Fels Lane as well as the seizures of the items on those premises impinged upon his Fourth Amendment rights.  He claims that the Fourth Amendment is applicable because he maintained a legitimate expectation of privacy in the property even though title had passed to the DVA. He argues further that the searches and seizures were not supported by probable cause or any of the exceptions to the Fourth Amendment's warrant requirement, such as exigent circumstances or consent.  Proper consent did not exist, Laney contends, because the DVA's ownership interest in 3612 Fels Lane "was inferior to [his] possessory and privacy interests."  Although conceding that the DVA had a property interest in the premises, Laney claims that Criddle, as DVA's agent, did not have authority to consent to search 3612 Fels Lane because Laney was a "tenant of the premises."

The State responds that the searches were supported by probable cause, exigent circumstances, and consent.  It asserts that the DVA could enter the property as owner of 3612 Fels Lane and take possession, as it did.  Moreover, under the State's view of consent, the DVA's sole possession of the house entitled its agent, Criddle, to search the premises and provide consent for other government officials to do so as well.

## A.  Property Interests

■ Answering the issues in this case requires some discussion of the principles of Maryland property law, particularly those governing the conveyance of foreclosed property.  Under Maryland law, as the following discussion demonstrates, Laney lost and the DVA acquired the right to possess the

3612 Fels Lane before Criddle entered the premises and discovered the contraband therein.

The Real Property Article of the Maryland Code and the Maryland Rules strictly govern foreclosure procedures. Generally, in the event that a purchaser of real property secured by a mortgage or deed of trust ("mortgagor") defaults under the terms of the mortgage or deed of trust, the holder of the security interest ("mortgagee" or "trustee") may initiate foreclosure proceedings. Maryland Code, § 7–105 of the Real Property Article (1974, 2003 Repl.Vol.) (governing the summary procedure for a power of sale in deed of trust); Maryland Rule 14–203 (setting forth the conditions precedent to commencing an action to foreclose a mortgage)[5]; *see Fairfax Savings, F.S.B. v. Kris Jen Ltd. P'ship*, 338 Md. 1, 15, 655 A.2d 1265, 1271–72 (1995) (discussing briefly the procedures for foreclosure pursuant to a power of sale clause in a deed of trust). Those proceedings lead to the eventual sale and conveyance of the property, which allows the mortgagee to attempt to recover the money owed on the mortgage debt.

Before the foreclosure sale may take place, however, the provisions of the Real Property Article and Maryland Rules require that the mortgagee fulfill certain notice requirements. Code, § 7–105 of the Real Property Article[6]; Mary-

---

**5.** Maryland Rule 14–203 states:

(a) Conditions precedent. (1) Generally. An action to foreclose a lien may be filed after (A) the instrument creating or giving notice of the existence of the lien has been filed for record, and (B) there has been a default in a condition upon which the lien instrument provides that a sale may be made or there is a default in the payment of the debt secured by a statutory lien.

**6.** The pertinent language of Section 7–105 of the Real Property Article states:

(b) *Notice to record owner of property; limitations of actions.*

(1)(i) In this subsection, "record owner" means the person holding record title to property as of the later of:

1. 30 days before the day on which a foreclosure sale of the property is actually held; and

2. The date on which an action to foreclose the mortgage or deed of trust is filed.

land Rule 14–206(b).[7]   Under Section 7–105 of the Real Prop-

---

(ii) In addition to any notice required to be given by provisions of the Annotated Code of Maryland or the Maryland Rules, the person authorized to make a sale in an action to foreclose a mortgage or deed of trust shall give written notice of the proposed sale to the record owner of the property to be sold.

(2)(i) The written notice shall be sent:

1.  By certified mail, postage prepaid, return receipt requested, bearing a postmark from the United States Postal Service, to the record owner; and

2.  By first class mail.

(ii) The notice shall state the time, place, and terms of the sale and shall be sent not earlier than 30 days and not later than 10 days before the date of sale.

(iii) The person giving the notice shall file in the proceedings:

1.  A return receipt; or

2.  An affidavit that:

A.  The provisions of this paragraph have been complied with; or

B.  The address of the record owner is not reasonably ascertainable.

(iv) The person authorized to make a sale in an action to foreclose a mortgage or deed of trust is not required to give notice to a record owner whose address is not reasonably ascertainable.

(3) In the event of postponement of sale, which may be done in the discretion of the trustee, no new or additional notice need be given pursuant to this section.

(4) The right of a record owner to file an action for the failure of the person authorized to make a sale in an action to foreclose a mortgage or deed of trust to comply with the provisions of this subsection shall expire 3 years after the date of the order ratifying the foreclosure sale.

7.    Maryland Rule 14–206(b) provides in relevant part:

(b) Notice. (1) By publication.   After commencement of an action to foreclose a lien and before making a sale of the property subject to the lien, the person authorized to make the sale shall publish notice of the time, place, and terms of sale in a newspaper of general circulation in the county in which the action is pending. . . . For the sale of an interest in real property, the notice shall be given at least once a week for three successive weeks, the first publication to be not less than 15 days prior to sale and the last publication to be not more than one week prior to sale. . . .

(2) By certified and first class mail.

(A) Before making a sale of the property, the person authorized to make the sale shall send notice of the time, place, and terms of sale by certified mail and by first class mail to the last known address of (i) the debtor, (ii) the record owner of the property, and (iii) the holder of any subordinate interest in the property subject to the lien.

(B) The notice of the sale shall be sent not more than 30 days and not less than ten days before the date of the sale to all such persons

erty Article, written notice of the proposed foreclosure sale must be sent by certified mail and first-class mail to the record owner of the property, who in many cases is the mortgagor. Maryland Rule 14–206 provides that the person authorized to conduct the foreclosure sale "shall publish notice" of the proposed sale in a newspaper of general circulation and further send notice by certified and first-class mail to the mortgage debtor, record owner, and the "holder of any subordinate interest in the property." Maryland Rule 14–303(b) provides that, where a third party trustee is appointed by the court to conduct the foreclosure sale, the trustee shall give notice by advertising "the time, place, and terms of sale in a newspaper of general circulation...." [8] Once proper notice has been provided, the one authorized to conduct the foreclosure sale may sell the property.

---

whose identity and address are actually known to the person authorized to make the sale or are reasonably ascertainable form a document recorded, indexed, and available for public inspection 30 days before the date of the sale.

(3) Other notice. If the person authorized to make the sale receives actual notice at any time before the sale is held that there is a person holding a subordinate interest in the property and if the interest holder's identity and address are reasonably ascertainable, the person authorized to make the sale shall give notice of the time, place, and terms of sale to the interest holder as promptly as reasonably practicable in any manner, including by telephone or electronic transmission, that is reasonably calculated to apprise the interest holder of the sale. This notice need not be given to anyone to whom notice was sent pursuant to subsection (b)(2) of this Rule....

8. In its entirety, Maryland Rule 14–303(b) states:

(b) Advertisement. Unless otherwise ordered by the court, a trustee proposing to make a public sale shall give notice by advertisement of the time, place, and terms of sale in a newspaper of general circulation in each county where any portion of the property is located. The notice shall describe the property to be sold sufficiently to identify it and shall be given as follows:

(1) for the sale of an interest in real property, at least once a week for three successive weeks, the first publication to be not less than 15 days before the sale and the last publication to be not more than one week before the sale; or

(2) for the sale of personal property, not less than five days nor more than 12 days before the sale.

■ Complete title does not immediately pass to the purchaser upon the sale of the property. The mortgagee first must submit to the court a report of the sale and an affidavit affirming the fairness of the sale and the truth of the report. Md. Rule 14–305(a).[9] The purchaser also must file an affidavit setting forth, in part, that the purchaser has not discouraged anyone from bidding for the property. Md. Rule 14–305(b).[10] Thereafter, the court shall issue notice of the sale by publishing a description of the property and a statement that the sale will be ratified by the court unless exceptions are taken within 30 days. Md. Rule 14–305(c).[11]

■ If no exceptions are filed within that period and the court is satisfied the sale was fair, the court shall ratify the sale. Md. Rule 14–305(e).[12] It is the court's ratification of the

---

9. Maryland Rule 14–305(a) states: "(a) Report of sale. As soon as practicable, but not more than 30 days after a sale, the person authorized to make the sale shall file with the court a complete report of the sale and an affidavit of the fairness of the sale and the truth of the report."

10. Maryland Rule 14–305(b) provides:

    (b) Affidavit of purchaser. Before a sale is ratified, unless otherwise ordered by the court for good cause, the purchaser shall file an affidavit setting forth:
    (1) whether the purchaser is acting as an agent and, if so, the name of the principal;
    (2) whether others are interested as principals and, if so, the names of the other principals; and
    (3) that the purchaser has not directly or indirectly discouraged anyone from bidding for the property.

11. Maryland Rule 14–305(c) states:

    (c) Sale of interest in real property; notice. Upon the filing of a report of sale of real property or chattels real pursuant to section (a) of this Rule, the clerk shall issue a notice containing a brief description sufficient to identify the property and stating that the sale will be ratified unless cause to the contrary is shown within 30 days after the date of the notice. A copy of the notice shall be published at least once a week in each of three successive weeks before the expiration of the 30–day period in one or more newspapers of general circulation in the county in which the report of sale was filed.

12. Maryland Rule 14–305(e) states:

sale that allows title of the property to pass to the purchaser. *See Plaza Corp. v. Alban Tractor Co.*, 219 Md. 570, 151 A.2d 170 (1959); *Fisher v. Federal Nat'l Mtg. Ass'n.*, 360 F.Supp. 207 (D.Md.1973).

■ Foreclosure, sale, and ratification operate to cut off the mortgagor's right of redemption—the right to repay the mortgage debt—and terminates the mortgagor's interest in the property. Section 7–105 of the Real Property Article states that the sale of foreclosed property and subsequent conveyance of the property to the purchaser "operates to pass all the title which the borrower had in the property at the time of the recording of the mortgage or deed of trust." *See Lippert v. Jung*, 366 Md. 221, 235, 783 A.2d 206, 214 (2001) (recognizing that if an owner of foreclosed property "fails to redeem, the purchaser acquires absolute title to the property") (quoting *LaValley v. Rock Point*, 104 Md.App. 123, 127, 655 A.2d 60, 62 (1995)); *Moss v. Annapolis Savings Inst.*, 177 Md. 135, 144, 8 A.2d 881, 884–85 (1939) ("The mortgagee [who purchased property at a foreclosure sale] . . . acquired the same title to the property that any other purchaser would have taken, and had the same power to rent, sell, or mortgage it that the mortgagor had when the mortgage was recorded."); *Sullens v. Finney*, 123 Md. 653, 657, 91 A. 700, 701–02 (1914); *Duval v. Becker*, 81 Md. 537, 548–49, 32 A. 308, 310 (1895).

■ As this Court has held as early as 1869 in *Lannay's Lessee v. Wilson*, 30 Md. 536 (1869), foreclosure, sale, and ratification also cause the mortgagor to lose the right of possession in the property. In *Lannay's*, the Court of Chancery issued a decree for the sale of mortgaged property and appointed a trustee to conduct the sale. *Id.* at 548. The mortgagee purchased property at the foreclosure sale, which

(e) Ratification. The court shall ratify the sale if (1) the time for filing exceptions pursuant to section (d) of this Rule has expired and exceptions to the report either were not filed or were filed but overruled, and (2) the court is satisfied that the sale was fairly and properly made. If the court is not satisfied that the sale was fairly and properly made, it may enter any order that it deems appropriate.

the Chancellor later ratified, and the mortgagor then turned possession of the premises over to the purchaser. *Id.* Arguing that the sale was defective because the trustee allegedly failed to deliver the property deed to the purchaser, the mortgagor's successor in interest filed an ejectment action. *Id.* at 545–46. The Court rejected the mortgagor's claim, favoring, instead, the view that ratification of the foreclosure sale divests the mortgagor of the right of possession, a requisite for prevailing on an action for ejectment. *Id.* at 550. Explaining the effect of the foreclosure sale, the Court stated:

[T]hough the decree [for the sale of mortgaged property] does not operate as a conveyance of the legal title, the purchaser, holding possession under it, does not hold wrongfully or unlawfully; and, consequently, all right of possession of those bound by the decree, and the proceedings under it, other than the purchaser, is divested and taken away, and, of course, with it the right to maintain ejectment.

*Id.* at 550.

The Court in *Lannay's* explained further that, after ratification of the sale, the right of possession to the foreclosed property lies solely with the purchaser:

A purchaser under a decree in equity, becomes the substantial owner of the property from the moment of final ratification of the sale, and he is entitled to and can recover the rents and profits of the estate. He is not only entitled to possession of the property, but it remains at his risk, notwithstanding the legal title may not be conveyed. By such sale the dry legal title, and the right of possession often become completely severed, at least for a time,—the legal title remaining in some of the parties to the cause, while the equitable estate and right of possession become vested in the purchaser.

*Id.; see also Merryman v. Bremmer,* 250 Md. 1, 8, 241 A.2d 558, 563 (1968) (stating that the purchaser of property at a foreclosure sale is entitled to possession of the property after the court ratifies the sale). After ratification of a foreclosure

sale, therefore, the right to possess the sold property lies with the purchaser, not the former mortgagor.

When a mortgagor loses the right to possess foreclosed property but fails to vacate the premises, the purchaser of that property, in lieu of actually taking possession, may seek a court order to remove the holdover mortgagor. *Zeller v. Silverman,* 143 Md. 339, 343, 122 A. 255, 256 (1923); *Applegarth v. Russell,* 25 Md. 317, 319–20 (1866). We embraced this concept in *Applegarth:*

> The practice is settled in this State, that when a purchaser at a [foreclosure] sale under a [judicial] decree has fully complied with the terms of sale, and possession of the premises purchased is withheld by a party to the suit, . . . the purchaser may obtain an order under which possession will be delivered to him by proper process.

25 Md. at 319–20. Also in recognition of the purchaser's right of possession, Maryland Rule 14–102(a) provides the right to use judicial process to acquire actual possession of an occupied premises. The Rule states in pertinent part:

> Whenever the purchaser of an interest in real property at a sale conducted pursuant to these Rules is entitled to possession, and the person in actual possession fails or refuses to deliver possession, the purchaser may file a motion requesting the court to enter a judgment awarding possession of the property.

When the landowner receives such a judgment awarding possession, upon the landowner's request, the "clerk [of the court] shall issue a writ directing the sheriff to place [the landowner] in possession of the property." Maryland Rule 3–647.[13] Although this judicial process may be used to oust a

---

13. Maryland Rule 3–647 states:

Upon the written request of the holder of a judgment awarding possession of property, the clerk shall issue a writ directing the sheriff to place that party in possession of the property. The request shall be accompanied by instructions to the sheriff specifying (a) the judgment, (b) the property and its location, and (c) the party to whom the judgment awards possession. The clerk shall transmit the writ

mortgagor who no longer is entitled to possession, the use of the term "may" in Rule 14–102(a) and in *Applegarth* reflects the fact that the ouster process is not mandatory to obtain possession of the purchased property. In other words, seeking the court's assistance in dispossessing the holdover mortgagor is only one option available to the purchaser to obtain possession from a holdover mortgagor. Failure to exercise that option does not undermine the mortgagee's ownership of the property nor the right to possession.

Rather, a purchaser with the right to possess property may take possession of that property peacefully without the court's assistance. This right was incorporated into Maryland law through the adoption of Article 5 of the Maryland Declaration of Rights, which establishes that "the Inhabitants of Maryland are entitled to the Common Law of England ... and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six. . . ." In *Moxley v. Acker*, 294 Md. 47, 50, 447 A.2d 857, 858–59 (1982), we discussed the evolution of the cause of action of forcible detainer, shedding light on the common law origin of the landowner's "right of self-help" to recover possession of real property:

> At common law and prior to the enactment of the statute of 5 Richard 2d, Chapter 8 (1381) in the 14th century, whenever a right of entry existed the party entitled to the right could lawfully enter and regain his possession by force. This right of self-help was curbed by 5 Richard 2d Chapter 8 which limited entries under claim of right to entries "not with strong hand, nor with a multitude of people, but only in a peaceable and easy manner."

and instructions to the sheriff. When a judgment awards possession of property or the payment of its value, in the alternative, the instructions shall also specify the value of the property, and the writ shall direct the sheriff to levy upon real or personal property of the judgment debtor to satisfy the judgment if the specified property cannot be found. When the judgment awards possession of real property located partly in the county where the judgment is entered and partly in an adjoining county, the sheriff may execute the writ as to all of the property.

*Id.* (quoting G. Liebmann, *Maryland Practice* 82–83 (vol.2, 1976)).[14] Our cases have not abrogated the landowner's common law "right of self-help" as modified by 5 Richard 2d, Chapter 8. *See* Maryland Code, § 14–115 of the Real Property Article (1974, 2003 Repl.Vol.) (listing the British statutes that "are no longer in force" in Maryland and not including 5 Richard 2d Chapter 8); *Eubanks v. First Mount Vernon Indus. Loan Assoc., Inc.,* 125 Md.App. 642, 662–63, 726 A.2d 837, 847 (1999) (stating that 5 Richard 2d Chapter 8, as incorporated by the Declaration of Rights, has not been repealed by the Maryland Legislature). The right of peaceable self-help, therefore, is a viable mechanism for a title owner of property to obtain actual possession of real property from a holdover mortgagor.[15]

---

**14.** The full text of 5 Richard 2d Chapter 8 (1381), as recorded in *Alexander's British Statutes* 247 (2d. ed., vol. 1, 1912), states:

And also the King defendeth, That none from henceforth make any Entry into any Lands and Tenements, but in case where entry is given by the Law, and in such case not with strong hand, nor with * multitude of people, but only in peaceable and easy manner. (2) And if any man from henceforth do to the contrary, and thereof be duly convict, he shall be punished by Imprisonment of his Body, and thereof ransomed at the King's Will.

**15.** Another remedy available to a mortgagee seeking to gain possession of property from a holdover mortgagor is through a cause of action of forcible detainer. After the enactment of the peaceable self-help provision under 5 Richard 2d, Chapter 8, England enacted two statutes providing for the cause of action of forcible detainer, a judicial remedy originally available only to an owner against a wrongful possessor who uses force to maintain possession. *See* 15 Richard 2, Chapter 2 (1391); 8 Henry 6, Chapter 9 (1429); *see Moxley v. Acker,* 294 Md. 47, 50–51, 447 A.2d 857, 859 (1982); *Greenbelt Consumer Servs., Inc. v. Acme Markets, Inc.,* 272 Md. 222, 227–28, 322 A.2d 521, 524 (1974); *Clark v. Vannort,* 78 Md. 216, 219–20, 27 A. 982, 983 (1893). This cause of action, applicable to mortgagees seeking to oust holdover mortgagors, has been modified by § 8–402(b) of the Real Property Article (1974, 2003 Repl.Vol.) to "include a remedy by which a landlord may recover possession of leased premises from a tenant 'Holding over' without force and by delineating the procedure for bringing any one of them." *Greenbelt Consumer Servs.,* 272 Md. at 227–28, 322 A.2d at 524. In *Moxley,* this Court further modified the "forcible detainer" action by deleting the requirement of force so that one can bring the cause of action to regain possession of property wrongfully detained in any way. 294 Md. at 53, 447 A.2d at 860.

Under the facts in the case at bar, the right to possess and title of 3612 Fels Lane clearly belonged to the DVA. Laney lost his right to possess the property when Commercial Federal purchased it at a public sale in Howard County that was "duly reported, ratified and confirmed by the Circuit Court for Howard County...." Subsequently, on January 6, 2000, the Circuit Court "substituted the [DVA] as the foreclosure sale purchaser in place and in stead of Commercial Federal Mortgage Corporation." Then, at least by the date of the deed, March 17, 2000, when fee simple in 3612 Fels Lane was granted to the DVA, the DVA obtained its ownership and the right to possession of the house.

---

Laney contends that, to obtain possession of 3612 Fels Lane, the DVA should have complied with the statutory procedures set forth by § 8–402(b) of the Real Property Article, the provisions governing ejectment of a holdover tenant. He relies on *Eubanks v. First Mount Vernon Industrial Loan Assoc., Inc.*, 125 Md.App. 642, 660, 726 A.2d 837, 846 (1999), in which the Court of Special Appeals held that the provisions of § 8–402(b) applied to mortgagees and mortgagors as well as landlords and tenants. The mortgagee in *Eubanks* brought actions of forcible detainer and for ejectment seeking to oust the mortgagor who refused to vacate the property after foreclosure. *Id.* at 648, 726 A.2d at 840. After the mortgagor elected a jury trial and the case was transferred to the Circuit Court for Anne Arundel County, that court, pursuant to §§ 8–402 and 8–818 of the Real Property Article, ordered the mortgagor to make monthly escrow payments for the use and occupancy of the property during the litigation. *Id.* On appeal, the mortgagor argued that § 8–402 did not apply because that section only governed actions between landlords and tenants, not actions between mortgagees and mortgagors. *Id.* at 659, 726 A.2d at 846. The Court of Special Appeals rejected this argument, stating that "forcible entry and detainer actions are properly brought pursuant to RP § 8–402(b), and therefore are actions subject to the rent escrow provisions of RP § 8–118." *Id.* at 660, 726 A.2d at 846.

*Eubanks* does not control and is distinguishable from the present case. The intermediate appellate court in *Eubanks* held only that § 8–402 applies when a mortgagee brings an action of forcible detainer. The court did not mandate that a mortgagee *must* pursue remedies under § 8–402 in order to oust a holdover. Indeed, the *Eubanks* court discussed 5 Richard 2, Chapter 8, the English statute providing for peaceable self-help, and acknowledged that it had not been repealed. *Id.* at 662–63, 726 A.2d at 847.

## B. Reasonable Expectation of Privacy

Notwithstanding Laney's lack of a property interest in 3612 Fels Lane, we must decide whether, under the United States Constitution, he had a legitimate expectation of privacy in that property on July 14, 2000. The Fourth Amendment to the United States Constitution, made applicable to the State through the adoption of the Fourteenth Amendment, guarantees the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Wallace v. State,* 373 Md. 69, 78 79, 816 A.2d 883, 889 (2003). The Fourth Amendment guarantees do not apply, however, unless the individual maintained "a legitimate expectation of privacy" in the houses, papers, and effects searched or seized. *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978); *Wallace,* 373 Md. at 79, 816 A.2d at 889; *Simpson v. State,* 121 Md.App. 263, 277, 708 A.2d 1126, 1133 (1998).

The one invoking Fourth Amendment protection bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979). The burden consists of two inquiries: (1) whether the individual has a subjective expectation that his or her property or possessions will not be searched, and (2) whether the expectation is objectively reasonable under the circumstances. *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998); *California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988); *Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401–02 n. 12; *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (1967)(Harlan, J., concurring); *Wallace,* 373 Md. at 81, 816 A.2d at 890; *Simpson,* 121 Md.App. at 277, 708 A.2d at 1133. As the Supreme Court has opined, reasonable expectations have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Carter,* 525 U.S. at 88, 119 S.Ct. at 472, 142 L.Ed.2d at 379 (quoting *Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401–02 n. 12); *Wallace,* 373 Md. at 81, 816 A.2d at 890.

In applying the reasonableness inquiry, courts have held that any expectation of privacy that squatters or trespassers have in the property they occupy but do not own is not objectively reasonable.[16] *United States v. Ruckman,* 806 F.2d 1471, 1472–74 (10 Cir.1986); *Amezquita v. Hernandez–Colon,* 518 F.2d 8, 11–12 (1st Cir.1975); *see Zimmerman v. Bishop Estate,* 25 F.3d 784, 787–88 (9th Cir.1994). *Ruckman* involved a search of a natural cave located on land owned by the United States and controlled by the Bureau of Land Management ("BLM"). 806 F.2d at 1471–72. The cave had been inhabited by Ruckman, a trespasser, for eight months when authorities discovered and seized illegal "anti-personnel booby traps" during a warrantless search of the cave. *Id.* at 1472. The Tenth Circuit Court of Appeals held that Ruckman's expectation of privacy was not reasonable under the circumstances:

> Ruckman was admittedly a trespasser on federal lands and subject to immediate ejectment. With respect to its own lands, the government has the rights of the ordinary proprietor, i.e., to maintain its possession and to prosecute trespassers. While he had been living off the land for several months, the cave could hardly be considered a permanent residence. Counsel himself describes Ruckman as "just camping out there for an extended period of time." Ruckman's subjective expectation of privacy is not reasonable in light of the fact that he could be ousted by BLM authorities from the place he was occupying at any time.

*Id.* at 1472–73 (citations omitted).

In *Amezquita,* the United States Court of Appeals for the First Circuit held that squatters did not have a reasonable

---

**16.** This is not to say that Laney had a *subjective* expectation of privacy. Because we decide that he did not have an objective expectation of privacy, we need not address whether Laney's giving a house key to a neighbor mitigated any subjective expectation of privacy he may have had.

expectation of privacy in the structures they had constructed on government-owned land. 518 F.2d at 11. Explaining its reasoning, the court stated:

> Nothing in the record suggests that the squatters' entry upon the land was sanctioned in any way by the Commonwealth. The plaintiffs knew they had no colorable claim to occupy the land; in fact, they had been asked twice by Commonwealth officials to depart voluntarily. That fact alone makes ludicrous any claim that they had a reasonable expectation of privacy.

*Id.* at 11. The court also found it persuasive that, in an eviction action prior to the alleged illegal search, a local court had ordered the squatters to evacuate the land and remove their structures. *Id.* The outcome of the eviction action, the court stated, "is further proof that the plaintiffs could not have any reasonable expectation of privacy." *Id.*

In *Zimmerman,* police officers searched a piece of property, which several individuals (squatters) improved and occupied against the expressed will of the owner, Bishop Estate. 25 F.3d at 786. Bishop Estate had made its objection to the squatters known by sending a letter and making several visits warning the squatters of their status as trespassers prior to the search. *Id.* at 786–87. After the search, Zimmerman, a house guest of the squatters, filed a civil rights claim, arguing that his Fourth Amendment rights had been violated by the search. *Id.* at 787. The court stated that Zimmerman had no greater right to be on the property than the squatters, and the squatters' "improvement of the property does not give rise to a reasonable expectation of privacy when they had no legal right to occupy the land." *Id.* at 787–88.

Unlike the privacy rights of squatters or trespassers, the tenant of a leased premises may maintain an expectation of privacy in the leased premises after the termination of the tenancy. *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856, 861 (1964), *reh. den.* 377 U.S. 940, 84 S.Ct. 1330, 12 L.Ed.2d 303 (1964); *Chapman v. United States,* 365 U.S. 610, 617, 81 S.Ct. 776, 780, 5 L.Ed.2d 828, 835 (1961);

*see United States v. Brazel,* 102 F.3d 1120, 1148 (11th Cir. 1997); *see generally Burks v. State,* 96 Md.App. 173, 194, 624 A.2d 1257, 1268 (1993). This is so, even if the tenant falls behind in his or her obligation to pay rent. *Browning v. State,* 176 Ga.App. 420, 336 S.E.2d 41, 43 (1985) (stating that non-payment of rent "is not conclusive" in determining whether the tenant relinquished her expectation of privacy in her apartment); *United States v. Botelho,* 360 F.Supp. 620, 625 (D.Haw.1973).

Nevertheless, where a lease agreement has expired, a tenant's expectation of privacy in that property also may diminish depending on the circumstances of the tenancy. Several courts have held that the hotel guest's reasonable expectation of privacy expires completely when the rental contract lapses. *United States v. Rahme,* 813 F.2d 31, 34 (2d Cir.1987) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room."); *United States v. Akin,* 562 F.2d 459 (7th Cir.1977); *United States v. Parizo,* 514 F.2d 52 (2d. Cir.1975); *United States v. Croft,* 429 F.2d 884, 887 (10th Cir.1970); *State v. Roff,* 70 Wash.2d 606, 424 P.2d 643 (1967); *see also United States v. Allen,* 106 F.3d 695, 697, 699 (6th Cir.1997) (holding that a hotel guest lost a legitimate expectation of privacy when the motel management lawfully "took possession of the motel room"); *United States v. Larson,* 760 F.2d 852, 855 (8th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985).

Other courts have maintained that the hotel guest's reasonable expectation of privacy may survive the expiration of the room agreement if the hotel has a practice of allowing guests to overstay the check-out time without consequence. *United States v. Kitchens,* 114 F.3d 29, 32 (4th Cir.1997); *United States v. Owens,* 782 F.2d 146, 150 (10th Cir.1986). If it is clear to the guest, however, that he or she must vacate the room after the rental period, the expectation of privacy in the room expires. In *Kitchens,* the Fourth Circuit Court of Appeals upheld the warrantless entry of a motel room after

the defendant guest had overstayed the rental period. 114 F.3d at 32. The court recognized that a hotel guest may retain a legitimate expectation of privacy after the rental period "if there is a pattern or practice which would make that expectation reasonable." *Id.* Because there was no evidence that the motel had "a pattern or practice" of allowing patrons to stay past check-out time but instead required them to check-out, the court held that the defendant had no legitimate expectation of privacy. *Id.*

According to at least one court, where a rental agreement for a hotel room has expired, the hotel guest loses a reasonable expectation of privacy only as to the hotel owner, who may consent to the search of the room after the rental period without risk of Fourth Amendment violations. *Carter v. State,* 72 P.3d 1256, 1260 (Alaska App.2003). In *Carter,* the defendant was the only one of four guests who remained in a hotel room "slightly past" the one o'clock check out time. *Id.* at 1258. Without authorization from the hotel management, the police ordered the defendant to gather his belonging and vacate the room. *Id.* While the defendant was following the officers' orders, he opened a drawer and exposed evidence that the police seized. *Id.* The court held that a hotel-room search by police without consent from the hotel proprietor violated the defendant's legitimate expectation of privacy even after the rental period passed. *Id.* at 1261. The court explained:

> Carter's expectation of privacy in the hotel room did not come to an abrupt end [at the check-out deadline]. In particular, Carter continued to have a right of privacy *vis-a-vis* the police. If the police had any authority to remain in Carter's room and order him to vacate the room, that authority had to be derived from the express consent of the hotel management.

*Id.; see also Allen,* 106 F.3d at 699 (holding that, after the motel management lawfully took possession of the defendant's room, "[t]he [motel] manager's consent to the officers' search of the room was all that was required to avoid constitutional infirmity").

██  As the previous discussion illustrates, courts consider a number of factors in determining the reasonableness of one's expectation of privacy in property occupied without permission of the owner. Some of these factors include the following: whether the individual had an ownership or possessory interest in the property, *Zimmerman*, 25 F.3d at 787–88; *Ruckman*, 806 F.2d at 1472–74; *Amezquita*, 518 F.2d at 11–12; whether the occupier of the property owned by another has been informed that he or she must vacate, *Kitchens*, 114 F.3d at 30, 31–32; *Zimmerman*, 25 F.3d at 787–88; *Ruckman*, 806 F.2d at 1472–74; *Amezquita*, 518 F.2d at 11–12; and the nature or outcome of any judicial remedies available to the land owner, *Amezquita*, 518 F.2d at 11–12.

Laney asks this Court to consider the issues within the context of a legitimately held-over tenant. We believe, however, that Laney's interest in 3612 Fels Lane is more akin to that of a trespasser and, therefore, any expectation of privacy that Laney had in 3612 Fels Lane was unreasonable. First, Laney at one time had owned 3612 Fels Lane, but he lost title to the premises as a result of the foreclosure of the mortgage and subsequent conveyance of title to the DVA. Indeed, Laney concedes that the DVA possessed the deed to the property at the time of the government searches in question. Therefore, he no longer had any right to occupy the premises. Further, as required by the Maryland foreclosure laws, Laney also had been notified that the foreclosure sale would take place and that 3612 Fels Lane had been purchased. It is clear that, after the sale, Laney no longer was entitled to occupy 3612 Fels Lane and that the new title owner could take possession.

██  With respect to the final element, the DVA had become the owner of the property and had the right to enter the premises by complying with all of the procedures required under Maryland foreclosure law. Once the DVA had the right to possess 3612 Fels Lane, Maryland law did not require the DVA to pursue some additional judicial remedy to evict Laney from the premises. Criddle, as the DVA's agent, acted consistently with the landowner's right to enter the premises with-

out court assistance by peaceably obtaining access to the house and entering without force.[17]

For these reasons, we hold that Laney had no reasonable expectation of privacy in 3612 Fels Lane. Consequently, the Fourth Amendment does not apply to the entry of the home on that property and the seizure of the evidence that formed the basis for Laney's convictions.[18] The Circuit Court correctly denied Laney's motion to suppress.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER*

---

17.   Laney cannot complain that he maintained a reasonable expectation of privacy in the seized evidence, itself. Once Criddle and law enforcement officials entered 3612 Fels Lane lawfully, they could seize evidence of an immediately apparent incriminating nature, such as the munitions and destructive devices discovered and seized in this case. *Horton v. California,* 496 U.S. 128, 136–38, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112, 121–22 (1990).

18.   Because Laney had no legitimate expectation of privacy in 3612 Fels Lane, we need not consider whether the circumstances of this case were exigent or whether consent justified the search if Laney had maintained a legitimate expectation of privacy.