**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frank William RUCKMAN, Defendant-Appellant.**

No. 85-2731.

United States Court of Appeals, Tenth Circuit.

Dec. 18, 1986.

Brent D. Ward, U.S. Atty., Bruce C. Lubeck, Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff-appellee.

Mark A. Besendorfer, Midvale, Utah, for defendant-appellant.

Before McKAY, TACHA and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Frank William Ruckman was convicted August 7, 1985, by a jury for the unlawful possession of destructive devices within the meaning of 26 U.S.C. § 5845(f)(3), namely, the possession of 13 anti-personnel booby traps which were not registered to Ruckman in the National Firearms Registration and Transfer Record as required by 26 U.S.C. § 5841, all in violation of 26 U.S.C. § 5861(d). Ruckman was given a suspended sentence and placed on probation for three years. Ruckman now appeals. We affirm.

Prior to trial, Ruckman moved to suppress the use at trial of any and all physical evidence seized in a warrantless search

of his "home." This search resulted in the seizure, *inter alia*, of the items which formed the basis for the charge above referred to. No testimony was offered at the hearing on the motion to suppress, counsel for Ruckman and the United States being in apparent agreement as to the critical facts. After argument of counsel, which included considerable colloquy between counsel and the court, the court, by minute order, denied the motion without any comment. Accordingly, we do not have benefit of the trial court's thinking on the issue raised.

From the record, it is agreed that the "home" which was searched by the authorities was a "cave" located in a remote area some 24 miles northeast of St. George, Utah, on land owned by the United States and controlled by the Bureau of Land Management (BLM). It is referred to as being a "natural cave," as opposed, apparently, to a "man-made cave." Ruckman had lived in and around the cave some eight months prior to the events which formed the basis for the present proceeding. Ruckman had attempted to "enclose" the cave by fashioning a crude entrance wall from boards and other materials which surrounded a so-called "door."

The fact that Ruckman was living in the cave area apparently became known to the local authorities. A state warrant calling for Ruckman's arrest issued when Ruckman failed to appear in state court to answer a misdemeanor charge. State and federal authorities later went to the cave area to arrest Ruckman on the state warrant. When the authorities arrived at the scene, Ruckman was nowhere to be found. In this setting, the authorities searched the cave. Certain firearms were found and seized. About this time, Ruckman appeared on the scene, and he was arrested and given his *Miranda* warning. Asked if there were any other weapons in the cave, Ruckman stated that there was a "shotgun in the corner." The shotgun was located and seized. Ruckman was then taken to the local jail.

Eight days later, the BLM agents and local authorities returned to the cave to "clean it out" and remove Ruckman's belongings. In cleaning out, the authorities found, and seized, the anti-personnel booby traps which formed the basis for the present prosecution.

Counsel agree that the ultimate issue is whether Ruckman had a right under the Fourth Amendment to be free from search, without a warrant, of his "home," in this case a natural cave, and counsel further agree that the more immediate issue is whether Ruckman had a subjective expectation of privacy in the cave, and, if so, whether his expectation is one which society is prepared to recognize as being reasonable under the circumstances. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). *See also Rakas v. Illinois*, 439 U.S. 128, 151, 99 S.Ct. 421, 434, 58 L.Ed.2d 387 (1978).

We shall assume that Ruckman entertained a subjective expectation of privacy, i.e., absent a search warrant or probable cause or exigent circumstances, none of which is contended for by the government, his cave could not be searched by any law enforcement officers without violating Fourth Amendment rights. However, the record, as we read it, contains no statement by Ruckman that he had any subjective expectation of privacy. Perhaps the filing of the motion to suppress presupposes such subjective expectation. In any event, we assume such subjective expectation. No doubt Ruckman would so testify. The real issue is whether such subjective expectation is reasonable under the circumstances of the case. Stated differently, the issue is whether the cave comes within the ambit of the Fourth Amendment's prohibition of unreasonable searches of "houses." Under the circumstances, we conclude that Ruckman's cave is not subject to the protection of the Fourth Amendment.

Ruckman was admittedly a trespasser on federal lands and subject to immediate ejectment. With respect to its own lands, the government has the rights of an ordinary proprietor, i.e., to maintain its posses-

sion and to prosecute trespassers. *United States v. Osterlund*, 505 F.Supp. 165, 167 (D.Colo.1981), *aff'd*, 671 F.2d 1267 (10th Cir.1982). While he had been living off the land for several months, the cave could hardly be considered a permanent residence. Counsel himself describes Ruckman as "just camping out there for an extended period of time." Ruckman's subjective expectation of privacy is not reasonable in light of the fact that he could be ousted by BLM authorities from the place he was occupying at any time. While it has been often stated, the Fourth Amendment protects people, and not places (*Katz, supra*, 389 U.S. at 353, 88 S.Ct. at 512), any determination of just what protection is to be given requires, in a given case, some reference to a place. And the place in this instance was on federal (BLM) land. The government's authority over federal lands has been clearly stated by the Supreme Court. "[T]he power over the public land thus entrusted to Congress is without limitations." *United States v. San Francisco*, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940), *reh'g denied*, 310 U.S. 657, 60 S.Ct. 1071, 84 L.Ed. 1420 (1940). This power derives from the Constitution. "[A]rticle IV, § 3, cl. 2 of the Constitution provides that 'the Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States.'" *Id.* A necessary ancillary to this regulatory power over lands within the public domain is the power to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights...." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405, 37 S.Ct. 387, 389, 61 L.Ed. 791 (1917). The Fourth Amendment itself proscribes, *inter alia*, an unreasonable search of "houses." Without belaboring the matter, we decline to hold that the instant case comes within the ambit of the Fourth Amendment. The fact that Ruckman may have subjectively deemed the cave to be his "castle" is not decisive of the present problem. As a Ninth Circuit case involving invalid mining

claims on public lands pointed out, "[A] person, under the guise of repeatedly locating invalid mining claims, may not use public lands primarily for residential purposes." *United States v. Allen*, 578 F.2d 236, 237–38 (9th Cir.1978).

We do not regard the circumstances underlying the "public telephone booth" (*Katz, supra*) or "public restroom" (*People v. Triggs*, 95 Nev. 436, 506 P.2d 232 (1973)) cases to be of particular relevance. The "open field" cases perhaps have more relevance. In explaining the distinction between "open fields" and the "certain enclaves" which should be free from arbitrary government interference, the Supreme Court has noted that, as a practical matter, "open fields" usually are accessible to the public and the police in ways that a home, an office or commercial structure would not be. *Oliver v. United States*, 466 U.S. 170, 179, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984). This Court has found that a person has no legitimate expectation of privacy even in his own private property where that property is surrounded by barbed wire fences, even if there are "No Trespassing" signs posted. *United States v. Rucinski*, 658 F.2d 741, 743–46 (10th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 649 (1982). Other cases with some degree of relevancy include *People v. Sumlin*, 105 Misc.2d 134, 431 N.Y.S.2d 967 (1980), in which the New York County Supreme Court held that a casual guest of the employee of a squatter in a city-owned abandoned building did not have any expectation of privacy and that defendant, as a trespasser who was wrongly on premises, could not claim Fourth Amendment violation of rights. *Id.*, at 969–70. In *People v. Smith*, 113 Misc.2d 176, 448 N.Y.S.2d 404 (1982), the court held that even if defendant was a subtenant, he could not derive any rights from one who has none, i.e., a squatter. *Id.*, 406.

A case having perhaps greater relevance than those above cited is *Amezquita v. Hernandez-Colon*, 518 F.2d 8 (1st Cir. 1975), *cert. denied*, 424 U.S. 916, 96 S.Ct. 1117, 47 L.Ed.2d 321 (1976). There "squat-

ters" moved onto land owned by the Commonwealth of Puerto Rico and built structures thereon. When the government threatened to oust them, the squatters brought a civil rights action seeking injunctive relief and damages. The district court ruled for the squatters. On appeal, the First Circuit reversed. In holding that the squatters had no reasonable or legitimate expectation of privacy, the First Circuit opined that, under the circumstances of that case, a claim that the squatters had a reasonable expectation of privacy was "ludicrous." *Amezquita, supra,* at 11. (Legitimacy of a privacy claim is determined by the totality of the circumstances. *Rakas, supra,* 439 U.S. at 152, 99 S.Ct. at 435. The test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity but whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment. *Oliver, supra,* 466 U.S. at 182–83, 104 S.Ct. at 1743.) Further, considering what constitutes a "home" for Fourth Amendment purposes, the First Circuit commented as follows:

> But whether a place constitutes a person's "home" for this purpose cannot be decided without any attention to its location or the means by which it was acquired; that is, whether the occupancy and construction were in bad faith is highly relevant. Where the plaintiffs had no legal right to occupy the land and build structures on it, those *faits accomplis* could give rise to no reasonable expectation of privacy even if the plaintiffs did own the resulting structures.

*Amezquita, supra,* at 12.

Judgment affirmed.

McKAY, Circuit Judge, dissenting:

The majority's opinion is a threat to those who fish in the Wind River mountains, those who enjoy survivalist expedi-

tions, and those senior citizens in their recreational vehicles in Bryce Canyon National Park who hold "Golden Eagle" or "Golden Age" Passports. Under the majority's sweeping language, they could be found at any time to be "trespassing" on federal lands and be stripped of any legitimate expectation of privacy in their temporary dwellings, since those dwellings fail to constitute "houses." The majority, in effect, holds that the right of anyone who is on public lands to be free from warrantless searches turns on whether they have overstayed their permit. Failing, presumably even on technical grounds, to have a "legal right" to occupy land prevents any reasonable expectation of privacy in a dwelling on such land from arising, *even if one owns* the structure searched on the illegally occupied land.[1]

## I.

In 1985, a state bench warrant for the arrest of Frank William Ruckman was issued in Washington County, Utah, for failure to appear with respect to a misdemeanor charge. After receiving information that Mr. Ruckman was living in a natural cave on Bureau of Land Management (BLM) property approximately twenty-four miles northeast of St. George, Utah, six heavily armed officers, both local sheriff's officers and federal law enforcement officers, proceeded to the cave site. When they arrived, they found a cave "that had wood and other articles placed in its opening so as to form some kind of living quarters. There was a wooden door that was closed but not locked and no one was in the vicinity." Brief of United States at 2. Without a search warrant, the officers entered the cave and seized three weapons. Mr. Ruckman, who arrived approximately one hour later and was arrested, informed the officers of a fourth weapon in the cave, which was then also seized.[2]

---

1. "Where the plaintiffs had no legal right to occupy the land and build structures on it, those *faits accomplis* could give rise to no reasonable expectation of privacy even if the plaintiffs did own the resulting structures." Maj. op. at 1474

(quoting and adopting *Amezquita v. Hernandez-Colon,* 518 F.2d 8, 12 (1st Cir.1975)).

2. These four weapons constituted the evidence supporting the first four of the five counts of the federal indictment instituted against Mr. Ruck-

Approximately eight days later, after Mr. Ruckman was incarcerated, BLM officers and local authorities returned to the cave, again without a warrant, "in an effort to clean it out and remove all this stuff that was in there, the door and everything else." Statement of Attorney for the Government, Transcript of Hearing on Motions at 20. While there, they found and seized the booby-trap devices that supported the fifth count of the indictment against Mr. Ruckman. He was subsequently convicted under this count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (1982).[3]

## II.

The court reaches its expansive result by first articulating the issue at hand as "whether the cave comes within the ambit of the Fourth Amendment's prohibition of unreasonable searches of 'houses.'" Maj. op. at 1472. That Mr. Ruckman lived in the cave for eight months, constructed a wall and door to the cave with wooden boards and other material, and installed the rudimentary comforts of home (including a bed, camp stove, and lantern) is not enough, says the court, to raise the fourth amendment priority that has always attached to one's residence, *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980), since he was "just camping out there for an extended period of time." Maj. op. at 1473. This conclusion is at odds with the multiple concessions on the part of the Government that Mr. Ruckman was "living" in the cave. *See* State-

ment of Attorney for the Government, Transcript of Hearing on Motions at 21–22 ("the Government searched that place which he was clearly using as a dwelling and they did that without a warrant"); record, vol. 1, document 11, at 2 ("Inside the dwelling was clear evidence that a person was living in and occupying that space."); *id.* at 4 (Government conceding that defendant "moved in"); Brief of United States at 5 (referring to cave "he was living in"); *id.* at 6 (referring to cave "in which he was living"). Moreover, although phrasing the issue as whether the cave constitutes a "house," much of the court's reasoning immediately following fails to analyze the characteristics of a house, but rather focuses on the fact that Mr. Ruckman was a "trespasser" on federal lands and, as such, could not have a reasonable expectation of privacy in his wilderness home. Viewing these as separate grounds for the court's holding, I find both fundamentally flawed and must respectfully dissent.

## III.

First, a finding that the cave fails to qualify as a "house" does not automatically mean that no legitimate expectation of privacy can attach to the cave for fourth amendment purposes. Even if Mr. Ruckman was "just camping out there for an extended period of time," it is not clear to me at *all* that a camper has no legitimate expectation of privacy in his temporary dwelling.

man. He was charged with violating 18 U.S.C. app. § 1202(a)(1) (1982), which provides in pertinent part:

Any person who—(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony ... and who receives, possesses, or transports in commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

In 1952, Mr. Ruckman was convicted in Illinois of being an accessory after the fact of armed robbery, and it was this felony that served as the underlying crime for purposes of § 1202(a)(1). These first four counts of the

indictment were dismissed during trial for reasons not related to the search at issue.

**3.** 26 U.S.C. § 5861 provides in pertinent part: "It shall be unlawful for any person—(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record...."

The penalty for violating this provision is found in 26 U.S.C. § 5871 which provides: "Any person who violates or fails to comply with any provisions of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both, and shall become eligible for parole as the Board of Parole shall determine."

After declining to equate the cave with a house, the court jumps to the conclusion that Mr. Ruckman can have no legitimate expectation of privacy in the cave. This analysis implicitly assumes that only homes and houses are accorded fourth amendment protection. This is simply untrue. The Supreme Court acknowledged as much when it recognized "the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois*, 439 U.S. 128, 142, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978) (citing *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). In ending the analysis after the myopic inquiry as to whether a cave is a house, the court fails to appreciate both the underlying, broader concerns of the fourth amendment and the ramifications its opinion will have in other contexts. Such inquiries as the court's are, of course, relevant as helpful guides, but should not be undertaken mechanistically. They are not ends in themselves; they merely aid in evaluating the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched.

Second, that Mr. Ruckman may have been a "trespasser" on federal lands should not be dispositive—either in good sense or in keeping with the evolution of fourth amendment theory. Such a position can lead to absurd results. Take, for example, the camper whose "Golden Eagle Passport," *see* 36 C.F.R. § 71.5 (1985), has expired but yet who nevertheless remains on federal land an extra day. Is he suddenly stripped at midnight of any reasonable expectation of privacy in his tent or recreational vehicle? [4] The court includes privately owned structures in its sweep. Can they now be searched at will by Government authorities, even though at a minute before midnight, such a search would violate the camper's fourth amendment rights? A right as fundamental as the right to be free from unreasonable searches and seizures should not turn on the mere happenstance of a permit's expiration date. Yet, that is the effect of the majority's holding.

Moreover, what of those BLM lands that are not "Designated Entrance Fee Areas" under 36 C.F.R. § 71.3 (1985), as is likely the case here? Regulations issued by the Secretary of the Interior to control the "use, occupancy and development of the public lands through leases, permits and easements," 43 C.F.R. § 2920.0–3 (1985), pursuant to the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1732, 1740 (1982), create some doubt whether Mr. Ruckman was, indeed, using federal land in an unauthorized manner. The Secretary's regulations state that "[n]o land use authorization is required under the regulations of this part for casual use of the public lands." 43 C.F.R. § 2920.1(d) (1985). "Casual use" is defined as "any short term non-commercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities." 43 C.F.R. § 2920.0–5(k) (1985). The Government has made no showing that the land encompassing the cave here was "prohibited by closure." Whether an eight-month residency in this cave constitutes "short term" activity is admittedly subject to debate. The Government, however, has not carried its burden of showing that Mr. Ruckman was a trespasser, other than to repeatedly refer to the cave as "the government cave." Brief of Plaintiff-Appellee at 3, 6; record, vol. 1, document 11, at 4.

More fundamental and worrisome than these observations, however, is that the court takes a giant step backward in fourth

---

**4.** Although the Supreme Court has extended the so-called automobile exception to mobile homes in *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), it did not do away with the threshold requirement that there be sufficient probable cause to search. No such showing was made in this case.

amendment analysis when it hinges its determination of whether Mr. Ruckman had a legitimate expectation of privacy in his dwelling on whether or not he was a "trespasser." In the early days of fourth amendment doctrine, property interests were not only a central tenet of search and seizure analysis, they were determinative. Persons aggrieved by searches and seizures needed to prove a property interest in the place searched or item seized superior to that of the Government's in order to gain redress through an action for trespass or replevin. So strong was the notion of property interests to search and seizure doctrine that "[n]o separate governmental interest in seizing evidence to apprehend and convict criminals was recognized; it was required that some property interest be asserted"—a rule better known as the "mere evidence" rule. *Warden v. Hayden,* 387 U.S. 294, 303, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967). Similarly, no fourth amendment violation was deemed to occur without a trespass by the Government upon property of the defendant—a rule better known as the "trespass doctrine." *Goldman v. United States,* 316 U.S. 129, 134–36, 62 S.Ct. 993, 995–96, 86 L.Ed. 1322 (1942); *Olmstead v. United States,* 277 U.S. 438, 457, 464, 466, 48 S.Ct. 564, 565, 567, 568, 72 L.Ed. 944 (1928). However, as our society evolved, the emphasis of the protection we enjoy from unreasonable governmental searches and seizures also evolved. Nearly twenty years ago, the Supreme Court recognized this evolution:

> The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be "unreasonable" within the Fourth Amendment even though the Government asserts a superior property interest at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts.

*Warden,* 387 U.S. at 304, 87 S.Ct. at 1648.

The landmark case of *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), cemented this privacy perspective when it disregarded the "trespass doctrine" enunciated in *Olmstead* and *Goldman.* Recognizing that, in our modern society, the fourth amendment "protects people, not places," the Court declared that what a person "seeks to preserve as private, *even in an area accessible to the public,* may be constitutionally protected. *Id.* at 351–52, 88 S.Ct. at 511 (emphasis added). Replacing the outmoded property-interest test was one articulated in Justice Harlan's concurrence: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516.

This focus on the expectation of privacy rather than on legal property interests in the place searched or items seized has not diminished since *Katz;* it has grown stronger. In *Rakas,* the Court stated that

> arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control....
>
> ... *Katz* held that capacity to claim the protection of the Fourth Amendment depends *not upon a property right in the invaded place* but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.

439 U.S. at 143, 99 S.Ct. at 430 (emphasis added). In other words, failing to have a legal property right in the invaded place does not, *ipso facto,* mean that no legitimate expectation of privacy can attach to that place. If it did, the above-quoted sentence describing *Katz* would be nonsensical, for fourth amendment protection would then, indeed, turn on a property right in the invaded place. Yet, this archaic analysis is the very analysis to which the majority subscribes. In *Rakas,* the Court reiterated that "[e]xpectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the inva-

sion of such an interest." *Id.* at 144 n. 12, 99 S.Ct. at 431 n. 12; *see also United States v. Salvucci,* 448 U.S. 83, 91, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980) ("This Court has repeatedly repudiated the notion that 'arcane distinctions developed in property and tort law' ought to control our Fourth Amendment inquiry." (citing *Rakas* )); *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) ("*Rakas* emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment."). To reach its result, the majority in this case, by reverting to discredited notions and obsolete fourth amendment analysis, flies in the face of this evolutionary precedent and of what the fourth amendment attempts to protect for us *all.*

So, at bottom, the critical inquiry here should be whether Mr. Ruckman had a legitimate expectation of privacy in the cave, so that he should be free, not from *all* searches, but from *unreasonable* searches—those undertaken without a warrant, as in this case, and without justification to forego a warrant.[5] Discussions concerning whether Mr. Ruckman was a "trespasser" or whether the cave was a "house" are merely red herrings when they mask this essential inquiry.

The court assumes that Mr. Ruckman entertained a subjective expectation of privacy and states that the "real issue is whether such subjective expectation is reasonable." Maj. op. at 1472. I believe his expectation of privacy in his wilderness home was both reasonable and legitimate.

It was perfectly legitimate for him to expect to be free from a warrantless search of the dwelling in which he lived continuously for eight months. He "took normal precautions to maintain his privacy," *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2561, by building a wall with a door of wooden boards and other materials, thereby sealing off the entrance to the cave. All his personal belongings were located therein. The cave was his sole living quarters in every sense, furnished with a bed and other crude furniture.

This finding does *not* mean that Mr. Ruckman was *entitled* to live in this cave. It does not mean that the Government has no recourse to remove him; the Government is free to prosecute him for any laws he may have violated. It simply means that the Government may not search his dwelling without a search warrant, as prescribed by the fourth amendment, or without sufficient justification excusing the warrant. The fact that Mr. Ruckman may have violated a federal law by living in this cave (a fact not established by this record) simply does not strip him of all his constitutional rights—just as the camper who overstays his Golden Eagle Passport, and thus trespasses on federal land, does not thereby forfeit his right to be free from warrantless searches of his tent or recreational vehicle in the absence of an exception to the warrant requirement. If anything, I would expect the legitimacy of "trespassing" Mr. Ruckman's expectation of privacy to be more clear-cut than that of the trespassing camper. The camper's residency in his tent would usually be extremely

---

**5.** The court asserts that the Government has plenary authority over federal land, but fails to relate the significance of this authority to this case. Rather, the court then immediately states in the next sentence that "[t]he Fourth Amendment itself proscribes, *inter alia,* an unreasonable search of 'houses.'" Maj. op. at 1473.

I readily concede that the Federal Government's regulatory power "over lands within the public domain [gives it the] power to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights...." *Id.* (quoting *Utah Power & Light Co. v. United States,* 243 U.S. 389, 405, 37 S.Ct. 387, 389, 61

L.Ed. 791 (1917)). The Federal Land Policy and Management Act of 1976 and the regulations promulgated thereunder that I cited earlier in this opinion attest to this authority. However, in light of the fourth amendment cases discussed above, I fail to see how the Government's regulatory power automatically strips Mr. Ruckman of any legitimate expectation of privacy in this case. Furthermore, I certainly fail to understand how this authority strips "trespassing" campers of any legitimate expectation of privacy in the tents and recreational vehicles which they own; yet such trespassers with their privately owned "structures" are within the court's broad sweep. *See supra* note 1.

short term, unlike the eight months Mr. Ruckman spent living in the cave. Moreover, the camper concededly has another, primary residency, whereas Mr. Ruckman's sole living quarters were this cave.

I would, therefore, reverse.