863 A.2d 1017

Wesley WHITING, a/k/a Jeffrey Wilson, a/k/a Lynell Whiting

v.

STATE of Maryland.

No. 1052, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 23, 2004.

286

Michael R. Malloy (Nancy S. Forster, Public Defender, on brief), for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, KENNEY, EYLER, DEBORAH S., JJ.

KENNEY, J.

A jury sitting in the Circuit Court for Baltimore City convicted Wesley Whiting, appellant,[1] of first degree murder, armed robbery, possession of a deadly weapon openly with intent to injure, first degree assault, and theft under $500. Appellant was sentenced to life imprisonment for the first degree murder conviction and to a consecutive twenty-five year term of incarceration for the robbery with a deadly weapon conviction. The remaining convictions merged. He presents two questions on appeal, which we have slightly reworded:

---

1. Appellant is also known as Jeffrey Wilson and Lynell Whiting.

1. Did the suppression court err in denying the motion to suppress evidence taken from appellant's "residence"?

2. Was the evidence sufficient to sustain appellant's convictions?

For the reasons that follow, we affirm the judgments of the circuit court.

## FACTUAL AND LEGAL HISTORY

William Moore was last seen at his job as a Correctional Officer around 1:35 p.m. on April 5, 2001. He did not report for his shift the next afternoon. When he did not report the following day, his supervisor asked Kedrick Wilson, another correctional officer, to check on him. Wilson tried to telephone Moore several times, but never got a response. Wilson asked Wortham Hall, a mutual friend, to check on Moore. Around 5:00 p.m. on April 7, 2001, when Hall went to Moore's home at 1136 Homewood Avenue, he saw that Moore's car was parked on the street, that mail was piled up at the door, and that the back door had tape on the lock so that it would not lock. Hall remained outside and called the police from his cell phone.

Baltimore City Police Officers Michael Lind, Dave Peters, and John Carroll were among the officers responding to Hall's call. Lind went inside Moore's home through the back door and observed that the kitchen area had been ransacked. When the officers searched the house to secure it, they saw a brown stain on the dining room carpet. They saw "a large amount of blood all over the wall and the carpet and everything else leaving a trail that was the brown stain on the carpet that we saw in the dining room area." The officers checked the basement and found Moore's body lying on the steps.

Melvin Stallings, a crime laboratory technician, arrived at the house around 5:10 p.m. He photographed the house, lifted fingerprints, and sketched the locations of possible evidence. Among the items noted were a pair of sweatpants, running

shoes, tennis shoes with suspected blood, possible footprints, and samples of suspected blood.

Lissette Rivbra, Rana Creamer, and Nina White, other crime lab technicians, processed the house after Stallings's shift had ended. Rivbra reported that they collected 39 fingerprint lift cards. They explained to the jury where each card was taken. One of the items the technicians recovered was a Rubbermaid trash can lid, which was found at the bottom of the steps between the first and second floor. The trash can itself was missing.

Lieutenant Kim Wilson, a co-worker and good friend of Moore's, testified that Moore was homosexual. Wilson told the jury that photographs of the crime scene did not reflect how Moore's house usually looked. She described Moore as "very, very particular, very, very neat, very organized, very detailed about how he put everything in his house everywhere, everything had a particular place, and he was very, very neat." She said that he had a pair of athletic shoes that were "all white; real, real clean." She testified that the shoes depicted in a photograph of the crime scene were not the shoes she had seen at Moore's house. Wilson said that Moore had had two televisions in his home.

Wilson told the jury Moore's cell phone number and that he had kept the phone charger in his house. She testified that Moore had called her most recently on March 30, 2001, at 8:52.[2]

On cross-examination, Wilson agreed that Moore "would have people over to his home." She also agreed that if Moore saw someone who needed money, Moore would give him work and pay him.

Homicide Detective Ronald Berger testified that he responded to 1136 Homewood Avenue at 5:26 p.m. on April 7, 2001. He videotaped the crime scene. At trial, he presented to the jury a photograph showing a calendar book on a night

---

2. Wilson could not recall whether Moore called her in the morning or at night.

stand, and told the jury that every day from the beginning of the year had a slash mark, up to and including April 5, 2001.

Berger also testified as an expert in blood stain pattern analysis. He explained that the blood stains on the wall indicated that the source of some of the blood was about a foot off the ground, and that there were signs of a struggle resulting in the smearing of blood droplets on a portion of the wall. According to Berger, "signs of bleeding were present and suggestive of a violent encounter which extended through the first floor between the front and back doors." Berger also concluded that "the final stage of a beating was low near the floor at the point of the living room of [sic] recess of the north wall."

Berger testified that he executed a search warrant on April 27, 2001, at 810 East Preston Street, the place were appellant allegedly lived. From a second floor rear bedroom, he recovered photographs, a letter addressed to appellant, and a letter addressed to Crystal Whiting. Detective Berger returned to the premises on May 3, 2001, to interview Robert Jones, also known as "Crystal Whiting." While there, Detective Berger observed a trash can in the second floor rear bedroom. Berger said that he did not recall seeing the trash can during the first search, but said that he had not been looking for a trash can at that time. Detective Berger obtained a search warrant the following day and recovered the trash can at that time.

Detective Berger told the jury that, on May 16, 2001, he spoke to Kevin Smith, an inmate with appellant at Central Booking, about inculpatory statements appellant had made. Berger reported that, at Smith's request, he wrote a letter to the Maryland Parole Board informing it of Smith's cooperation.

Detective Kevin Turner also examined Moore's home. Turner showed the jury photographs depicting a TV stand in the bedroom with the television missing and a living room table with dust around the outline of "something that was the size of a television set." In addition, Turner retrieved a Sprint

telephone number from Moore's wallet and contacted Sprint to get information about the last phone numbers called from that phone. As a result of records he received from Sprint, Turner learned that no phone calls were made from the phone in the six days prior to Moore's death. With the records, Turner also was able to trace the phone to Derrick Venable. Turner did not recover the cell phone, but did recover the battery and charger from Venable's room. On cross-examination, Turner acknowledged that Venable had told him that his friend Jamal had tried to buy the phone three or four days before he bought it. Detective Turner also contacted Rubbermaid and learned that trash cans of the style found in appellant's room had been shipped to Lowe's and to an Ace Hardware store in Maryland in ten shipments of 36 each between January and September 2000.

Robert Jones testified that he lived with appellant at 801 East Preston Street in April 2001. Jones said that they had an intimate relationship, and that, because he considered himself appellant's wife, he called himself "Crystal Whiting." Jones reported that, in early April 2001, appellant had left the East Preston Street home and returned two or three hours later with a bite or cut mark on his chin and a swollen finger. According to Jones, appellant said that "he had been in a fight with someone, and he left and they might not have been breathing." Jones reported that appellant returned with a cell phone and $40 in cash. Jones said that appellant was wearing two rings when he returned, but that they may have been the same ones appellant had worn when he left. Jones acknowledged, however, that he told the detectives in April 2001, that he had assumed that appellant got the rings from Moore's house. He said that appellant returned wearing a different pair of pants than he had worn when he left. Jones also said that appellant had been wearing "a pair of tens;" the "tens" were Timberland boots. Jones also said that he and appellant went to get medical treatment for appellant's finger on April 9, 2001, the day after the injury. Medical records indicated that appellant also had injuries on his shoulder and cheek.

Jones identified the trash can as being the one in the bedroom that he and appellant shared. Jones explained that appellant "brought [the trash can] in from outside." Jones also testified that appellant sold the cell phone to "some kid around the neighborhood" for $15. Jones read a letter he had written appellant telling him he would let him know if he heard anything about the phone, because "there was some talk in the neighborhood about a phone that was being used by some young kids that belonged to someone that had got killed around the neighborhood," and he wanted to know if it was that phone. Jones testified that appellant sometimes used the name "Lamont Wilson."

On cross-examination, Jones repeated that appellant wore two rings when he left home and two when he returned home, and that the rings could have been the same. He also said that when he spoke to the detective the first time, the detective told him he could go to jail.

Salvatore Bianca, a serologist with the police, testified as an expert in trace analysis. Bianca examined the trash can lid found at Moore's house and the trash can found on East Preston Street. Both were made by Rubbermaid and both were the same "visual color, style, shape, brand, had the same slide locking function, and the lid physically fit onto the trash can and engaged the locking function." Suspected blood from the trash can and from the lid were submitted to the Maryland State Police for DNA analysis. Bianca concluded that it was possible "for this trash can lid to at one time be associated" with the trash can found in appellant's bedroom, but he could not say for certain whether they were parts of the same set.

Bruce Heidebrecht, a DNA analyst with the State Police Crime Lab, testified that DNA from the blood found on the Rubbermaid trash can lid matched DNA from an oral swab from Moore, and that DNA in the blood taken from the trash can matched DNA in the oral swab from appellant. Lorraine Lansey, a fingerprint expert employed by the Baltimore Police Department's Latent Print Unit, testified that fingerprints

found on the outside of the trash can lid matched appellant's left middle and left ring finger, and that a palm print found on the outside of a letter holder matched appellant's left palm. Prints matching appellant's right palm were found on the second floor hallway closet doorframe. A latent print in blood on a wall partition was compared to appellant's but did not match.

Dr. David Fowler, acting Chief Medical Examiner for Maryland, performed an autopsy on Moore on April 8, 2001. Using photographs taken at the autopsy, Fowler showed the jury "multiple impact sites" on the side of Moore's face and nose. He reported that Moore's skull had been crushed and that "brain matter" "ooz[ed] out of the cranial cavity," and that the palm of Moore's hand had been split, indicating a "severe amount of force." He testified that Moore also had abrasions on his shoulder and defense wounds on the forearm. Fowler testified that there were "a minimum of 41 impacts to the head area and a minimum of 13 impacts to the hand area," as well as three defensive wounds on the arm. He opined that a hammer or tire iron was used, explaining that knuckles or hands would not have enough force to fracture the skull or cause the lacerations.

Fowler explained that "no single blow" would have killed Moore, and that death was the result of "a cumulative effect of multiple blows, mostly to that area in the back of the head." He further explained that the number of wounds "implies some dynamic situation where there is movement during at least . . . an initial phase of the assault, but then again, there is a very concentrated area in one spot, which implies that at some stage it became a static assault." He opined that Moore had been killed at least 36 hours prior to the autopsy.

Kevin Smith testified that, in April and May 2001, he was incarcerated at Central Booking with appellant. He reported that appellant told him that "he got into a struggle with the victim, and that they was like battling for a long period of time. He like used words to the effect like, it took me a long time to kill this mother-fucker. He was battling all the way to

the end." Smith added that the victim was a homosexual and a correctional officer. According to Smith, appellant said that the struggle occurred "right before [appellant] got locked up," and that it lasted between 20 and 35 minutes. According to Smith, appellant told him that he went to Moore's house to rob him because he had heard that Moore kept money at home. Smith told the jury that appellant showed him injuries on his hand and chest. He stated that appellant also said he took a cellular phone from the victim and sold it to some kids. He said that appellant told him that the incident "wasn't too far" from where appellant lived. Smith reported that conversation and spoke to Detectives Ronald Berger and Albert Marcus on May 16, 2001.

Smith acknowledged that he expected that the detectives "would in some type of way help me," in exchange for the information. He reported that Detective Berger wrote a letter on his behalf when he appeared before the Parole Board and that his parole was reinstated. Smith acknowledged that he was also cooperating with Alcohol, Tobacco, and Firearm (ATF) agents and that an ATF agent and a Drug Enforcement Agency agent appeared on his behalf on the prior charge, which was stetted. On cross-examination, Smith explained that his parole was for robbery with a deadly weapon and that, had his parole been violated, he could have been sentenced to up to 20 years of incarceration.

Jeffrey Bolden, a friend of appellant's, testified that appellant lived in an abandoned home on Preston Street. He said that appellant had telephoned him collect prior to April 2001. He reported that appellant telephoned him at 12:46 p.m., 4:09 p.m., and 4:17 p.m. on April 6, 2001, and that the name "Moore" appeared on the Caller ID. Bolden went on to say that he had called that phone at 4:16 p.m. and 4:17 p.m. that day, and that appellant had returned his call from that phone at 4:30 p.m. Bolden also testified that he received calls from the cell phone to his house at 1:08 a.m. and 1:12 a.m. the next day, but none after that. Bolden recounted that when he spoke to appellant on the afternoon of April 6, 2001, appellant told him that a friend had let him use his cell phone.

Bolden testified that, on April 6, 2001, he gave appellant a ride in the car for three or four minutes, and that appellant did not have any bites or scratches or show any discomfort. Bolden acknowledged, however, that it was dark outside and that appellant was fully clothed.

Rodney Carter testified that he had hired appellant as a security guard in 1991, and that they had remained friends. He testified that appellant had telephoned him from Moore's cell phone at 5:12 p.m. on April 6, 2001. According to Carter, appellant sounded normal during their conversation.

Derrick Venable testified that he lived at 721 East Preston Street, around the corner from Homewood Avenue and down the street from the 800 block of Preston Street. He said that he did not know appellant but had seen him "[a] couple of times" "[a]round the neighborhood." Venable testified that he had chosen appellant's photograph from a photo array and identified appellant at trial as the person who had sold him Moore's cell phone and charger for $15 on a Saturday in April 2001. Venable said that he had lost the phone, but that the police had come to his house and taken the charger. Chanika Baker, a friend of Venable's, testified that Venable and his friend Jamal had telephoned her and her friend Danielle Williams several times from Moore's phone, the first call being at 8:22 p.m. on April 7, 2001.

Detectives Turner and Berger interviewed appellant on April 30, 2001. Appellant told the officers that he had bought the cell phone around the end of March from a white drug addict he knew as "Slick," and that three days later he had sold it to some kids. Appellant denied that he knew of any correctional officer who lived in East Baltimore.

Appellant testified that he bought the cell phone for five dollars from a "white guy in my neighborhood named Slick," and that he sold it to Derrick Venable. Appellant explained that he did not make telephone calls with it at first because the battery was dead and he had to charge it. He said that he knew Moore from the neighborhood, and explained that he had been inside his house because Moore had once paid him to

clean his house. He said that he told the detectives during the interview that he did not know a correctional officer who lived in East Baltimore because he did not know Moore's full name or that he was a correctional officer.

Appellant testified that he had regarded Jones as his wife, but that he also had had a girlfriend. He asserted that he had been injured during a "domestic issue" with his girlfriend. Appellant disputed Jones's testimony, denying that he had money when he returned home with injuries, and countering that Jones had brought the trash can into the house. He said that he got his blood on it when he was injured on April 22, 2001.

Appellant acknowledged that he knew Kevin Smith from jail, but alleged that Smith had seen copies of his charging papers and had seen an article about his case in the newspaper. He conceded that he had been untruthful with Detectives Berger and Turner about his sexual orientation, explaining that he did not know why they were asking about it and that he found it too personal to reveal.

The defense also called Detective Berger as a witness, who testified that he found the trash can on the second floor bedroom on May 4, 2001. Additional facts will be set forth as needed in our discussion of the questions presented.

## DISCUSSION

### I. *Motion To Suppress*

As noted, Detective Berger twice searched appellant's bedroom at 810 East Preston Street. Prior to trial, appellant filed a motion to suppress the evidence recovered during the second search. Appellant alleged that the evidence had first been observed by Detective Berger while he was in the building without a warrant, and, therefore, it was obtained illegally. The State asserted that appellant had no standing to raise the issue.

At the suppression hearing, appellant offered as evidence of standing the affidavit for a search warrant, stating that " 'a

witness who reported knowing [appellant] said when interviewed that [appellant] had told him that he had been living at the address determined to be the vacant house at 810 East Preston Street.' " Appellant also submitted a letter addressed to one of his aliases, a college registration form in appellant's name, and a letter from appellant to Crystal Whiting, found at that address.

The State countered with a deed for the property showing that it was owned by the Housing Authority of Baltimore City. The State also submitted a certified statement dated April 1, 2002, which named the lessees and reported that they had been evicted for non-payment of rent on May 16, 2000. The statement also reported that "[a] call [to] BGE indicated that the meters are still hooked up, but there has been no activity reflected over the past two years based on their records."

In addition, the State submitted the registration confirmation offered by appellant, pointing to the address of 1038 Liberty Road, dated August 31, 2000; a copy of the Central Booking processing information indicating that appellant stated his address was 609 29th Street; a copy of appellant's motor vehicle record, which indicated addresses of 550 Saint Mary's Street and 828 East Preston Street; and a copy of appellant's April 22, 2001 arrest information, giving his address as 609 North Ellwood Avenue.

Detective Ronald Berger testified that when he visited the property in April and May of 2001, the front door to 810 East Preston Street was sealed. Detective Berger did not recall whether the house had a functioning lock at the rear door, but stated that the rear door was unlocked when he went there. He said that the rear door had a doorknob and a broken window, and that there was a "bolt-type" lock above the door knob. Detective Berger also testified that there was bedding on the floor in two locations in the house and that there was a television in one of the rooms.

Robert Jones testified that he stayed at 810 East Preston Street, but that he did not pay rent to anyone. He said that "quite a few people" lived there. He said that he did not have

keys to the premises, and did not know whether anyone else had keys, but that the back door was always unlocked. According to Jones, he had "experienced" the electricity being on while he was there.

On cross-examination, Jones testified that appellant lived at 810 East Preston Street, and agreed that appellant "basically had a room of his own." He did not know how long appellant had lived there. Jones reported that appellant had a key to the door to his room and that he locked it. Jones said that appellant did not want anyone to come into his room.

The prosecutor argued that appellant had no standing to contest the entry into the room, and pointed out that Detective Berger had been able to enter the room when he executed the search warrants. Defense counsel argued that "there are a lot of vacant houses in this City, a lot of people live in vacant houses." He conceded that the Housing Authority could have gone into the property and dispossessed appellant, but asserted that it could not go into the house and seize property for a criminal prosecution.

The suppression court found that appellant was "occupying the property in some manner," but commented that there was no evidence that any of the personal property there belonged to appellant. It agreed that appellant did not expect the "general public to walk in and out and to pick up his property," but noted that "the public policy of the City of Baltimore and the State of Maryland is to keep these properties vacant," and that "the property owner who culpably allows their property to be occupied by squatters" was violating the City Housing Code. It noted that appellant was committing a criminal trespass, and ruled that his expectation of privacy was not one that society was prepared to recognize. Accordingly, it ruled that appellant did not have standing to contest the validity of the search of the room.

Appellant contends that the suppression court erred in denying his motion to suppress the fruits of the search of the bedroom at 810 East Preston Street. The State counters that

appellant was a trespasser and had no reasonable expectation of privacy.

### Standard of Review

In considering a denial of a motion to suppress, we are limited to the record of the suppression hearing. *See State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003); *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002). "We view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the prevailing party on the motion." *Laney v. State*, 379 Md. 522, 533, 842 A.2d 773, *cert. denied*, —— U.S. ——, 125 S.Ct. 434, 160 L.Ed.2d 335, 2004 WL 2151171 (2004). *See Green*, 375 Md. at 607, 826 A.2d 486.

We accept the suppression court's findings of first-level facts unless clearly erroneous, giving due regard to the court's opportunity to assess the credibility of witnesses. *See Green*, 375 Md. at 607, 826 A.2d 486. In determining whether the action in question was proper, we "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Green*, 375 Md. at 607, 826 A.2d 486 (*citing Collins*, 367 Md. at 707, 790 A.2d 660). *See also Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

### *Standing*

An individual seeking to invoke Fourth Amendment protection

> bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized. The burden consists of two inquiries: (1) whether the individual has a subjective expectation that his or her property or possessions will not be searched, and (2) whether the expectation is objectively reasonable under the circumstances.

*Laney*, 379 Md. at 545, 842 A.2d 773 (internal and end citations omitted). In *Laney*, the Court of Appeals noted:

In applying the reasonableness inquiry, courts have held that any expectation of privacy that squatters or trespassers have in the property they occupy but do not own is not objectively reasonable.

*Id.* at 546, 842 A.2d 773 (citations omitted).

In that case, the Court considered the status of a mortgagor who had remained on foreclosed property after the purchaser obtained legal title and the right of possession. Reviewing cases from other jurisdictions, the Court identified factors that courts had considered "in determining the reasonableness of one's expectation of privacy in property occupied without permission of the owner," including

whether the individual had an ownership or possessory interest in the property; whether the occupier of the property owned by another has been informed that he or she must vacate; and the nature or outcome of any judicial remedies available to the land owner.

*Id.* at 550, 842 A.2d 773 (citations omitted).

The Court rejected Laney's contention that he should be treated as a "legitimate[ ] h[o]ld-over tenant," concluding that his status was "more akin to that of a trespasser and, therefore, any expectation of privacy that Laney had [in the foreclosed property] was unreasonable." *Id.* It noted that Laney did not have title to the property, that he had been notified of the foreclosure sale, and that it had been purchased. In fact, it appears that the door to the foreclosed house had been locked, because a neighbor of Laney's, who had a key to the house, let the purchaser's agent inside. *See Laney,* 379 Md. at 528–29, 842 A.2d 773. The Court also noted that the purchaser had the right to enter the property.

Here, appellant never held title to the premises he claims that he was occupying. Nor did he have permission to be there. As defense counsel agreed, the Housing Authority had the right to eject appellant from the property. Although the electricity was on, the records indicated that no one was using it, which suggests that the occupants took pains to conceal their presence in the building.

Other courts that have considered the issue have held that trespassers and squatters do not have privacy rights that society is prepared to recognize. In *Amezquita v. Hernandez–Colon*, 518 F.2d 8, 9 (1st Cir.1975), government officials threatened to evict members of a squatter community who had built "houses" on government land. The squatters brought an action against the government for injunctive relief and damages. Although the district court granted an injunction, the United States Court of Appeals for the First Circuit vacated the order and held that the squatters did not have a protected property interest in the government property, even if they had built structures on it. *See id.* at 12–13. The court reasoned that

> whether a place constitutes a person's "home" for this purpose cannot be decided without any attention to its location or the means by which it was acquired; that is, whether the occupancy and construction were in bad faith is highly relevant. Where the plaintiffs had no legal right to occupy the land and build structures on it, those *faits accomplis* could give rise to no reasonable expectation of privacy even if the plaintiffs did own the resulting structures.

*Id.* at 12.

*Commonwealth v. Gordon*, 546 Pa. 65, 683 A.2d 253 (1996), upon which appellant relies, does not persuade us otherwise. In *Gordon*, the Pennsylvania Supreme Court stated that, even if Gordon's placing a sheet separating his room from the rest of the house, his use of electricity, and his placement of a mattress and a television in his room were sufficient to show that he had a subjective expectation of privacy in a room in an abandoned house, he would still have to show that it was a reasonable expectation. *Id.* at 257. It also noted that there was no testimony that Gordon hung the sheet himself and that his "claimed exclusion of the public from the dining room is implausible because the evidence revealed that the house had an unlocked, open exterior door." *Id.* at 258. In addition, the *Gordon* Court noted that the "mere use of property" is not

sufficient to establish a legitimate expectation of privacy. *Id.* at 258.

Although appellant, in distinguishing *Gordon,* argues that his locking of his door evidences his "right to exclude others," we disagree. In cases involving trespassers, courts have concluded that attempts to exclude others do not create a reasonable expectation of privacy.

In *United States v. Ruckman,* 806 F.2d 1471, 1472 (10th Cir., 1986), the United States Court of Appeals for the Tenth Circuit held that a cave located on land owned by the United States government and controlled by the Bureau of Land Management ("BLM") was not within the protection of the Fourth Amendment. Ruckman "had attempted to 'enclose' the cave by fashioning a crude entrance wall from boards and other materials which surrounded a so-called 'door.' " *Id.* The Court noted that Ruckman was "admittedly a trespasser on federal lands" and concluded that "Ruckman's subjective expectation of privacy is not reasonable in light of the fact that he could be ousted by BLM authorities from the place he was occupying at any time." *Id.* at 1472–73.

In *Davis v. State,* 119 S.W.3d 359, 367 (Tex.App.2003), *discretionary review refused* (2004), the court upheld a trial court's ruling that Davis was a trespasser in a house even though he had a key to the house and thus "the ability to let people come in and out of the place." The appellate court noted that "the trial court as factfinder could have found that Davis did not obtain the key from anyone with any legitimate ownership or possessory interest in the property, or that Davis had no key at all, and that he had no right to exclude others from the property." *Id.*

In *People v. Gaffney,* 308 A.D.2d 598, 764 N.Y.S.2d 727, *leave to appeal denied,* 1 N.Y.3d 597, 776 N.Y.S.2d 229, 808 N.E.2d 365, and *sub nom People v. Williams,* 1 N.Y.3d 603, 776 N.Y.S.2d 234, 808 N.E.2d 370 (2004), the Appellate Division of the New York Supreme Court held that a homeless person had no reasonable expectation of privacy in his room at a homeless shelter. It noted further that

[t]he defendant could not create any expectation of privacy by placing clothes over the wire mesh to block visual access to the room or by locking the door with a broomstick handle.

*Gaffney,* 308 A.D.2d at 598, 764 N.Y.S.2d 727.

██ Appellant also argues that "[s]ociety cannot afford to disregard the constitutional rights of citizens merely because they are indigent." We, of course, agree with that general principle, but here the constitutional right to be protected is dependent upon a reasonable expectation of privacy. Because the Housing Authority could enter the premises or could permit anyone else to do so, and because appellant had no right to exclude anyone from the premises, lock or no lock, any expectation appellant had that the police would not enter the premises was unreasonable. While "the poorest man may in his cottage bid defiance to all forces of the crown," as the suppression court quoted, the property in question did not belong to appellant. In fact, although appellant apparently was "occupying" the premises, there was evidence that he had other homes elsewhere. We are persuaded that the suppression court correctly ruled that appellant had no reasonable expectation of privacy in the premises.

## II. Sufficiency Of The Evidence

Appellant's second contention is that the evidence was insufficient to sustain his convictions. He contends that there was no evidence of premeditation or deliberation, and that "the nature of the injuries to the decedent showed great rage, which could only have resulted from hot blood."

Appellant also contends that the evidence was insufficient to prove his criminal agency. As support, he notes that there was no eyewitness who placed appellant at the scene at the time of the crime, that appellant's testimony explained why the blood was on the trash can, that he testified that Robert Jones brought the trash can into the building, and that there was no evidence that appellant had taken Moore's cell phone. He also notes that Kevin Smith and Robert Jones received

benefits in exchange for their testimony and the testimony of both was therefore unreliable. The State counters that the contention, so far as it relates to criminal agency, was unpreserved, and that, in any event, the evidence was ample.

## Standard of Review

■■■ The standard for our review of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see State v. Suddith*, 379 Md. 425, 429, 842 A.2d 716 (2004); *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001). Furthermore, "[w]eighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998).

## Premeditation

In *Pinkney v. State*, 151 Md.App. 311, 827 A.2d 124, *cert. denied*, 377 Md. 276, 833 A.2d 32 (2003), we considered the elements of premeditated, first degree murder. We stated:

> The Maryland Criminal Pattern Jury Instructions 4:17 (2001), which were used by the trial judge in this case, define those three elements by stating:
>
>> Wilful means that the defendant actually intended to kill the victim. Deliberate means that the defendant was conscious of the intent to kill. Premeditated means that the defendant thought about the killing and that there was enough time before the killing, though it may have only been brief, for the defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.
>
> The Court of Appeals has reinforced the application of those definitions by stating that first degree murder requires "that the defendant possess the intent to kill (willful), that the defendant have conscious knowledge of the intent to kill

(deliberate), and that there be time enough for the defendant to deliberate, *i.e.*, time enough to have thought about that intent (premeditate)." *Willey v. State,* 328 Md. 126, 133, 613 A.2d 956 (1992) (holding that the jury instructions adequately distinguish between first and second degree murder).

*Pinkney,* 151 Md.App. at 331–32, 827 A.2d 124. Noting the difficulty in understanding those concepts in the abstract, we further explained the elements, including premeditation, by quoting the Court of Appeals in *Willey v. State,* 328 Md. 126, 133–34, 613 A.2d 956 (1992), that " '[i]f the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder.' " *Pinkney,* 151 Md.App. at 335, 827 A.2d 124 (alteration in *Willey)* (citations omitted). The *Pinkney* Court quoted *Cummings v. State,* 223 Md. 606, 611, 165 A.2d 886 (1960), stating that,

> "in order to justify a conviction of murder in the first degree, the trier of facts must find the actual intent, the fully formed purpose to kill with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper, but that the mind has become fully conscious of its own design."

*Pinkney,* 151 Md.App. at 335, 827 A.2d 124. In *Willey,* the Court of Appeals stated "that the delay between firing a first and a second shot was enough time for reflection and decision to justify a finding of premeditation and deliberation." *Willey,* 328 Md. at 134, 613 A.2d 956 (citations omitted).

 Here, Detective Berger testified as an expert in blood stain spatter analysis that the blood stains on the wall indicated that there was "a violent encounter which extended through the first floor between the front and back doors." Dr. Fowler testified that there were multiple impact sites on Moore's face and nose and that there were at least 57 impacts. Fowler went on to say that "no single blow" killed Moore and

that his death was the result of "a cumulative effect of multiple blows." His testimony also supported Berger's testimony, in that he agreed that the number of wounds "implies some dynamic situation where there is movement during at least ... an initial phase of the assault."

That evidence was clearly sufficient to permit the jury to conclude that there was a long struggle and that appellant had more than enough time to decide to kill Moore. In addition, Kevin Smith testified that appellant told him that he got into a struggle with Moore and that it took a long time to kill him. That statement, in itself, would indicate that appellant had time to decide whether to kill Moore.

Appellant also asserts that Moore's injuries and "the disordered condition of the crime scene indicate that Mr. Moore died during a struggle that constituted a hot blooded confrontation" and could constitute only manslaughter. We disagree. Although Moore's injuries and the "disordered condition of the crime scene" may have suggested a struggle, the evidence supports the conclusion that the struggle resulted from Moore's efforts to defend himself. There was no evidence that Moore did anything to provoke appellant or that appellant was enraged. *See Sims v. State,* 319 Md. 540, 551, 573 A.2d 1317 (1990). In *Sims,* the Court of Appeals rejected a similar contention, commenting:

> Even if we were to find the evidence sufficient to objectively show adequate provocation, there is not a shred of evidence showing the state of mind of the defendant at the moment of the shooting. Sims' testimony sheds no light on this because he testified that he was not there.

*Id.* at 553, 573 A.2d 1317.

 Here, appellant denied the killing and the only evidence of a motive was that supplied by Kevin Smith—robbery. In addition, a killing done in a rage is not necessarily manslaughter. *See Girouard v. State,* 321 Md. 532, 538, 583 A.2d 718 (1991)(killing in the heat of passion does not constitute manslaughter unless other factors, including legally sufficient provocation, are present).

■■■■■■■■■■■■■■■

*Criminal Agency*

Appellant also asserts that the evidence is insufficient to establish that he was the criminal agent and notes that "[t]here was no eyewitness who placed Appellant at the scene at the time of the crime." As noted, the State asserts that this issue is not preserved for our review.

■■■■■■■ We agree with the State that the issue is not preserved. Maryland Rule 4–324(a) requires that, as a prerequisite for appellate review of the sufficiency of the evidence, appellant move for a judgment of acquittal, specifying the grounds for the motion. The language of the rule is mandatory, *State v. Lyles,* 308 Md. 129, 135, 517 A.2d 761 (1986), and review of a claim of insufficiency is available only for the reasons given by appellant in his motion for judgment of acquittal. *See Graham v. State,* 325 Md. 398, 416–17, 601 A.2d 131 (1992); *Bates v. State,* 127 Md.App. 678, 691, 736 A.2d 407 (1999).

■■■■■■■ We would, in any event, find no merit in that contention. It is not necessary that there be an eyewitness placing appellant at Moore's home at the time Moore was killed. "Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Hall v. State,* 119 Md.App. 377, 393, 705 A.2d 50 (1998). "[G]enerally, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Pinkney,* 151 Md.App. at 327, 827 A.2d 124.

Robert Jones testified that, in April 2001, appellant had left the East Preston Street home for two or three hours and returned with a bite or cut mark on his chin and a swollen finger. Jones recounted that appellant told him that "he had been in a fight with someone, and when he left, they might not have been breathing." Jones also testified that when appellant returned, he had a cell phone and $40 in cash. Smith testified that appellant admitted to him that he killed a

correctional officer who lived not far from his East Preston Street residence and that he took a cell phone from the officer, which he sold to some kid. The evidence established that Moore lived near appellant and that appellant had used Moore's cell phone to telephone Bolden and Carter within hours of Moore's death. This was sufficient to permit the jury to infer that appellant killed Moore and stole his phone.

In *Anglin v. State*, 244 Md. 652, 663, 224 A.2d 668 (1966), the Court of Appeals upheld the breaking and entering conviction of a man who had used a credit card taken in a burglary that had occurred within the past few days. The Court noted:

> It has long been established in Maryland that, absent ·a satisfactory explanation, exclusive possession of recently stolen goods permits the drawing of an inference of fact strong enough to sustain a conviction that the possessor was the thief, or, if the circumstances revealed by the testimony so indicate, that he was the receiver of the stolen goods.

*Id.* at 656, 224 A.2d 668 (citations omitted). The inference was again applied in *Dinkins v. State*, 29 Md.App. 577, 582, 349 A.2d 676, *adopted by, Dinkins v. State*, 278 Md. 238, 362 A.2d 91 (1976), and was recognized more recently in *Smith v. State*, 367 Md. 348, 359, 787 A.2d 152 (2001), and in *Grant v. State*, 318 Md. 672, 680, 569 A.2d 1237 (1990).

As the United States Supreme Court commented in *Wilson v. United States*, 162 U.S. 613, 620, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) (citations omitted), affirming Wilson's conviction for murder:

> Proof that defendant had in his possession, soon after, articles apparently taken from the deceased at the time of his death, is always admissible; and the fact, with its legitimate inference, is to be considered by the jury along with the other facts in the case in arriving at their verdict.

Although appellant testified that he had bought the cell phone from someone named "Slick" before Moore was murdered, the jury was not required to believe his explanation. *See Morgan v. State*, 134 Md.App. 113, 759 A.2d 306, (2000); *Dinkins v. State*, 29 Md.App. at 582, 349 A.2d 676; *see also*

*Acquah v. State,* 113 Md.App. 29, 54, 686 A.2d 690 (1996)("The jury is the trier of fact and is not obliged to believe the explanations or denials offered by the defendant.").

Furthermore, Jones testified that appellant was wearing a pair of sweatpants when he left, but returned wearing a different pair of pants. A pair of sweatpants was recovered from Moore's home. Appellant's fingerprints were on the lid of a trash can found in Moore's home, on a letter opener in Moore's home, and in Moore's upstairs closet. Jones testified that appellant had brought a trash can into the room, which the State established matched the trash can lid found at Moore's home.

We find no merit in appellant's contention that Smith and Jones were not credible witnesses because they were promised something in return for their testimony. Appellant's assertion goes to the weight of the evidence, not its sufficiency. *See Ruth v. State,* 133 Md.App. 358, 365, 757 A.2d 152 (2000). The jury was free to accept all, part, or none of their testimony. *See Ruth,* 133 Md.App. at 365, 757 A.2d 152. In rejecting a similar argument, the Court of Appeals explained *in Kier v. State,* 216 Md. 513, 520, 140 A.2d 896 (1958), that

the trial court had the witness before them and were better able to judge the weight to be accorded the testimony of this witness than is this court. The trial court was certainly justified in giving to this admission such weight as they thought the credibility of the witness justified.

Here, the jury heard that Smith expected and received a benefit for his testimony and that Jones had been threatened with jail before he made a statement inculpating appellant. The jury was able to consider those factors along with any others in determining whether Jones and Smith were credible witnesses.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**